BYROM K. STICKLE

*v.*

LIBBIE M. STICKLE.

In a suit by a husband against his wife for divorce it was proved that there were frequent and clandestine meetings between the wife and her alleged paramour. And the husband produced more than ninety letters, which were in the handwriting of the alleged paramour, addressed to the wife, written within a period of about fourteen months, during which the clandestine meetings were

had, and which, by their volume and reference to trivial passing events, gave internal evidence of their authenticity as part of a correspondence with the wife. He, in addition, testified that he had found the letters, respectively, either in his wife's pocketbook or in her locked trunk, to which he did not have access. The wife, called as a witness in her own behalf, and advised by competent counsel, failed to deny knowledge of the letters, or to contradict any of her husband's statements with reference to them.—*Held,* that the statements contained in such letters, so far as they allege acts and mental conditions of the wife, will be regarded as admissions by her.

Final hearing on bill, answer and proofs.

*Mr. Theodore Little,* for the complainant.

*Messrs. Vredenburgh & Garretson,* for the defendant.

The Chancellor.

The complainant seeks a divorce from his wife, alleging as a cause, her adultery with one Charles J. Fox. Both he and the defendant have lived from childhood at Rockaway, in Morris county. They were married there in 1876, and now have two children, daughters; the elder, Helen, about thirteen years of age, and the younger, Mary, two years her junior.

For several years the complainant has allowed himself to become so absorbed in his business that he has neglected his wife and children and failed to participate with them, to any considerable extent, in home life and social pleasures and duties. He has occupied his time chiefly, in partnership with his brother, in a lumber-yard, and, alone, in the management of a farm and a large general merchandise store. The evidence establishes that it has been habitual with him to remain at his store from early morning until late at night, taking from his business pursuits barely sufficient time to go home, a distance of half a mile, to his meals.

He is forty years old; about eight years his wife's senior.

Charles J. Fox was also reared in Rockaway, and was the neighbor, friend and frequent guest of the complainant and defendant. He is unmarried and about thirty years old. For several years he was the village postmaster. In July, 1889, be-

cause of political changes, he was thrown out of that position and became the complainant's bookkeeper. He remained in the latter position until the following February, when the complainant discharged him, under the circumstances hereafter related.

The complainant testifies that on Sunday, the 16th day of February, 1890, he went home from his store at about nine o'clock at night, ·in company with an employe named William Haller, who was accustomed to sleep at his house; that he went to his wife's bed-room and there, upon a table, saw her pocket-book partially open, so that money and a letter in it were exposed to his view, and that he took out the letter and read it. It was· without date, in the handwriting of Fox, and commenced in this wise:

"*My own Precious and Darling Lib:*" [and continued in portions of it as follows]—"My darling, you ask me if I miss you. Yes, indeed, I do miss seeing your sweet, smiling face, as I told you in my letter of yesterday. I would like to have you with me just now, and have your dear, sweet lips pressed to mine, for—well, just about an hour, without letting up at all. I am sure I could stand it, but my dearest could not, could you darling? My dear, you speak of it being so warm in Trenton. * * * Well, my darling, I stayed with the boss again last night, and wished for my own true love just the same as usual, all the time thinking of you, dearest, because it does seem as tho' I wanted you where I could gaze at or hold you in my arms, you precious darling. I wish I was with you when you were feeling so badly yesterday. * * * I am your own darling and true lover, J."

Folded with this letter was another writing by Fox, also without date, which commences abruptly at the top of a sheet, as though in the middle of an epistle. It begins:

" I hope, my dear " [and continues in places in this language]—" I have seated myself· (with your dear, loving face before me) to write you a few lines before I retire, and to tell you how glad I was to learn of your condition to-night. Now, dearest one, don't think from this that I am glad of your being unwell, but that you are out of all danger of getting in any trouble from our being together, and when you said to-night that I wouldn't care to be with you to-night you were very much mistaken, because I do not love you for one purpose alone, but I love you for all and forever. * * * Now, my dear girl, I beseech of you not to accuse me of not loving after what has transpired in the past two or three days, because, my darling, I love you just the same, if not more than ever, if such a thing is possible, and I do wish you had not made arrangements for another bed-fellow to-night, because, my dear one, I would

have come just as willingly and spent a few hours with you as I did the night before, because you have been so good to me and sacrificed so much to add to my pleasure and enjoyment, and I feel that I can never pay you for it. * * * Never be afraid to look me straight in the face with the same stern, frank, yet loving, look, because I respect and honor you as much as though we had a right to be together for the two nights that we were in each other's society. * * * Good night, sweetheart, and believe me always your own darling, J."

The complainant further testifies that he remarked to Haller, who had accompanied him to his wife's room, that the defendant was careless with her pocketbook, and then, after counting his wife's money, commenced to read the letter he had found, and, recognizing the handwriting of Fox, read it aloud to Haller, and that then he and Haller started out to find the defendant, going to her father's house, about a mile distant. On their way, he says, they talked about the letter. When he reached his father-in-law's house he found Fox and Fox's brother there, but not the defendant. He says that he greeted those present generally, but said nothing in particular to Fox. Shortly after he left his father-in-law's, and Fox and his brother left at the same time. The complainant walked ahead with Haller, and the Fox brothers followed. As they were passing the house of the defendant's sister, Fox suggested that the defendant might be there, and the complainant and Haller stopped. There he found the defendant, and, after a short visit, went home with her. He said nothing to her about the letter he had found. When they reached home, Haller went to his room, and the complainant and his wife retired. The complainant says that he undressed and laid down a minute, and then, making the excuse that he was not sleepy and had an inventory to write, he got up and dressed, and, rousing Haller, went with him to the store, and remained there till morning.

Early in the morning he consulted his cousin, a lawyer in Rockaway, and later went to Morristown to lay his discovery before his present counsel. Later in the day he returned home, and, in the evening, talked with Fox in the office of his store. Upon cross-examination he relates his conversation with Fox at this interview as follows:

"I asked him if he had been corresponding with my wife, writing clandestine letters to her; he said yes, he had; I asked him if she ever wrote any letters to him; he said, 'Yes;' I said, 'Did you ever write her many letters?' He said he had, quite a good many, and also said that Mrs. Stickle had written him a good many letters; I asked him where those letters were that Mrs. Stickle wrote to him; he said he burnt them up. I had quite a long talk with him after that, about ruining my family, and asked him what he thought about it, and he appeared to be very sorry. * * * Well, we had quite a long talk. I asked him if he ever kissed and hugged Mrs. Stickle. He said he had; I said, 'Charley, you have betrayed me, haven't you?' he said yes, he had. I says, 'Charley, what would you do if you was in my place—would you live with such a woman as that?' He said, 'I don't know what I would do if I had two children.' I asked him if he would marry such a woman as Mrs. Stickle if he had a right to get married to her. He said, 'No.' I said, 'You wouldn't marry such a woman as that, Charley, would you?' He said, 'No.' I told him to come down to the store in the morning."

The next morning Fox was discharged. The complainant states that he has not seen him or corresponded with him since. This was on Tuesday morning. The same day the defendant went to New York city, and while she was away the complainant, procuring the services of a locksmith, opened her trunk, and there found ninety or more letters in the handwriting of Fox. Many of them were in envelopes, which, through the cancellation of postage stamps, at various dates, appear to have gone through the post-office at different times. Others do not appear to have been posted. The dates indicate that the first of them was written in December, 1888. They cover two hundred and fifty printed pages, and, without exception, abound in expressions of an intense sensual love, so commonplace, monotonous and devoid of piquancy as to make their examination a most burdensome task. They refer to incidents and conversations and express desires which, if founded in fact, prove an unrestrained intimacy between the writer and the defendant.

He speaks, among other things, of his difficulty in keeping away from her "dear, sweet lips;" of his longing to have her near that he may "love" and "caress" her and "impress on those darling warm and loving lips an occasional kiss;" of their being intimate; of his "starving" for her; of his almost breaking her back by his embraces; of his visits to her at her home

Stickle *v.* Stickle.

and of her visits to him at the post-office after it had closed for the night; of his "devouring" her with his "love;" of his desire to keep his lips pressed to hers all the time and his wonder whether they could "keep it up all night;" of his wish to have her in his "arms once more;" of their narrow escapes from the complainant's detection; of his fear that their love may be discovered, and that she may suffer in consequence, and the like.

The proofs show that upon one occasion Fox was taken sick while at the complainant's house, and that he remained there all night. In one of his letters, without date, he uses this language:

"My darling, when you came to my bedside the other night I felt just like pulling you in the bed with me, for I hate to see you leave me, because I know if you had been with me I think I would have been the happiest mortal on this earth. But no, two lovers had to be content to sleep with such a wide space between us, and under the same roof in the bargain."

In another letter he wrote apologetically:

"I am, indeed, very sorry that you took my meaning for *bad.* * * * Well, my dear, I tell you what I meant when I said, 'I hope in some future day that you may rest in the way you desire; I did not mean it for anything *bad* at all—when you said you would be happy if you could go to bed and fall asleep in my arms.' Since you accuse me of meaning *bad,* I have come to the conclusion that—well, I will not say what I was going to; I will tell you when I see you again."

In another letter he stated that she had asked him how he would like to be the bed-fellow of a certain woman whom she mentioned, and added that he would like it for one night. In still another letter he said:

"Well, my darling, you have no more wish for me than I have for you when I have been in bed alone, and, my darling, it would be glorious indeed to be allowed the privilege of being in bed with one I love so dearly, and having her rest on my arm all night; yes, my dear, it would be heavenly, and, my own true love, I agree with you, that we might as well have the '*game as the name*' of being *bad.*"

In another letter he referred to the defendant's worry about the early physical development of her elder daughter, and advised

her that it was her duty to make explanations to the child, and then added that the intimacy between him and her enabled him to broach this topic.

It is claimed that these letters prove desire and opportunity, from which I should infer adultery.

Before I consider their probative force, it will be well to state the other proofs with which I have to deal.

It has been shown beyond contradiction that Fox frequently visited the complainant's house, not only when the complainant was at home, but also when he was away, and that upon occasions he would remain with the defendant alone in the parlor or in her bed-room for more than an hour at a time. One servant testifies that she has seen the defendant watching for Fox, and that after one of his visits the defendant instructed her not to mention the fact of the visit to Mr. Stickle, and another servant testifies that once from the yard she saw the defendant close the shutters of her bed-room while Fox was in the bed-room with her, and other witnesses speak of seeing the defendant and Fox walking together frequently in the night. A young man gives evidence of having twice seen the defendant come from the post-office, after it had been closed for the night, once alone and once with Fox.

The defendant admits that Fox visited her and was in her bed-room, but she insists that the room was a sitting-room, as well as bed-room, frequented by the inmates of the house; that it contained her sewing-machine and a sofa, and that the bed was a wardrobe bedstead, shut up during the day. She also admits that she visited the post-office, but denies that she was ever in it after it had been closed for the night. She denies that she ever closed the shutters of her bed-room so that Fox might not be seen there, and she denies that she was ever guilty of "*improper*" conduct with Fox, and that she ever committed *adultery* with him. She fails to define what she means by the word "*improper.*" She does not once, in the course of her testimony, allude to the letters of Fox. She does not deny their receipt by her; that they were in her trunk; that one was taken from her pocketbook; that she corresponded with Fox, or that she was kissed and embraced

by him.  She contents herself with the uncertain denial of "*improprieties*" and her declaration that she did not commit adultery. . She was not cross-examined.

Aside from the letters, I fail to find full proof of adultery. Opportunity is sufficiently shown, and, as well, a censurable and imprudent friendship with Fox and plain desire to be in his company, but, without the letters, I would not be convinced that adulterous desire existed.  The proximate acts proved would leave me in that state of doubt which should be resolved in the defendant's favor.

Taken with the letters, however, the proofs present a very different case.  If the letters are parcel of a correspondence between the defendant and Fox, and are to be regarded as admissions of conduct and desires, adultery is established beyond peradventure.  How do they stand?  They are put in the case, in the first instance, by the testimony of the complainant alone.  It is a noteworthy fact that neither William Haller nor the locksmith, who opened the defendant's trunk, were called as witnesses. Their absence has not been explained, and, had the defendant denied knowledge of the letters, I think it would have been fatal to the complainant's case, for he alone should not be permitted to establish this very material part of the proof.  But the defendant goes upon the witness-stand and, being advised by competent counsel, undertakes to meet the case against her, yet is strangely silent upon the vitally important subject of these letters.  Her silence, under these circumstances, comes as a tacit admission of the truth of her husband's testimony and of her receipt and concealment of those papers.  In face of this silence, the suggestion of her counsel, that the correspondence may have been the product of conspiracy between the husband and Fox, comes without force.  Indeed, a bare perusal of the great volume of letters, full of reference to passing and trivial events, written upon divers papers, enclosed in a variety of envelopes, stamped with different post-marks, filling a multitude of pages, reiterating a hundred times the same expression and covering a period of fourteen months, exhibits so great an absence of studied design as to commend them as *bona fide* productions.  To accept them as parcel

of the execution of a conspiracy would require me to accord to the complainant and Fox a patient, vicious perseverance, deep cunning and consummate skill, which is plainly beyond their ability and unwarranted by proofs. Indeed, the mere superabundance of letters negatives the idea that they were the product of a corrupt agreement, for in one-fiftieth part of the mass presented, all the matter that would be necessary to give it effect could, and naturally would, have been written.

Now, accepting the letters as those of a lover which were secretly received, retained and concealed, and, contemplating the further circumstance that while they were being received the defendant constantly accepted and sought the society of that lover, I feel constrained to give them the full force of implied admissions by the defendant against her interest, in proof, not only of the adulterous desire which is necessary to inferential proof of her guilt, but also of the very crime of adultery itself, for I can read the language of the papers found in her pocketbook in no other light than as an admission of adultery.

That such force is due to them under the circumstances stated, is established. *Hobby* v. *Hobby, 64 Barb. 277; 2 Phil. Ev. 449; Loveden* v. *Loveden, 2 Hagg. Cons. 51.*

It has been insisted for the defendant that she is addicted to the continuous and excessive use of morphine; that that fact was known to the complainant; that the complainant for several years has been anxious to be divorced from her, going so far as to declare that he would give $500 for proof of her adultery; and it is argued from this and his invitations to Fox to visit his house, his neglect of his wife, and his spiritless accounting with the man who had dishonored him, that if it is not proved that he conspired with Fox to falsely convict the defendant of adultery, it is at least shown that he connived at her seduction.

It is proved that, to some extent, she was accustomed to take morphine, but to what extent is not shown. It is impossible to determine from the evidence that the habit in any degree affected her moral stamina. She makes no mention of the habit in her testimony. That her husband knew of the habit is a mooted question. He denies all knowledge of it. That the complainant

Stickle *v.* Stickle.

·once before suspected her of infidelity, and that their relations have been most unhappy, is abundantly shown by the bill and answer in divorce proceedings between them in 1885. It was upon that occasion that he fretfully declared that he would pay $500 for proof of her adultery. These conditions may, in a great measure, account for the complainant's absorption in his business pursuits and neglect of his wife, but they do not show affirmative connivance. They give room for nothing more than conjecture. His lack of spirit in dealing with Fox may have been due to unmanly cowardice or a mercantile habit of weighing his actions by profit and loss. Indeed, the fact that the defence of connivance is resorted to, in light of the failure to deny the receipt of Fox's letters, itself strengthens the conviction that the defendant was guilty of the adultery charged.

But it is insisted that, in view of the complainant's past suspicions of his wife, he was bound to watch her, and that his careless neglect to do so, and to discover and prevent her relations with Fox, amount to a passive connivance, which should preclude him from obtaining a decree of divorce. And here the doctrine enunciated in this state by Chancellor Zabriskie in *Hedden* v. *Hedden, 6 C. E. Gr. 61, 74,* and followed by Vice-Chancellor Van Fleet in *Cane* v. *Cane, 12 Stew. Eq. 148,* that if a husband sees what a reasonable man could not see without alarm, or if he knows that his wife has been guilty of incontinence, whereby he is put upon his guard respecting her weakness, he is called upon to exercise a peculiar vigilance and care over her, and if he sees what a reasonable man could not permit and makes no effort to avert the danger, he must be supposed to see and mean the result, is invoked. It is observed that in this case the complainant did not know that his wife had ever been guilty of incontinence. He merely suspected it, and, eventually so far abandoned his suspicions as to live for years with her as her husband, and the complainant most solemnly avers that he never, previous to finding the letter in her pocketbook, had suspected unlawful or improper relations between her and Fox. There is nothing to indicate that Fox had not previously been of good repute for morality. He had been a life-long friend of both the

complainant and defendant. I think it would establish a dangerous precedent to put this case within the doctrine applied to the two cases last cited. To require a suspicious vigilance upon the part of a husband who once may have entertained a groundless suspicion of his wife's fidelity, in itself would be apt to engender doubt and mistrust that would continually threaten conjugal happiness. The essential elements of the doctrine referred to are lacking here. There was neither knowledge of previous incontinency nor knowledge of questionable relations between the defendant and Fox. It is, of course, to be deplored that the complainant did not devote more time to the supervision of his wife and family, but, that he failed to do so, will not disentitle him to the decree he now asks.

I will grant the divorce.