## REPOUILLE v. UNITED STATES.

No. 92, Docket 20777.

Circuit Court of Appeals, Second Circuit.

Dec. 5, 1947.

FRANK, Circuit Judge, dissenting.

———◆———

Edward S. Szukelewicz, of New York City, Mario Pittoni, of Brooklyn, and J. Vincent Keogh, U. S. Atty., of New York City, for the appellant.

Louis Loftus Repouille, pro se.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The District Attorney, on behalf of the Immigration and Naturalization Service, has appealed from an order, naturalizing the appellee, Repouille. The ground of the objection in the district court and here is that he did not show himself to have been a person of "good moral character" for the five years which preceded the filing of his petition.[1] The facts were as follows. The petition was filed on September 22, 1944, and on October 12, 1939, he had deliberately put to death his son, a boy of thirteen, by means of chloroform. His reason for this tragic deed was that the child had "suffered from birth from a brain injury which destined him to be an idiot and a physical monstrosity malformed in all four limbs. The child was blind, mute, and deformed. He had to be fed; the movements of his bladder and bowels were involuntary, and his entire life was spent in a small crib." Repouille had four other children at the time towards whom he has always been a dutiful and responsible parent; it may be assumed that his act was to help him in their nurture, which was

[1] § 707(a) (3), Title 8 U.S.C.A.

being compromised by the burden imposed upon him in the care of the fifth. The family was altogether dependent upon his industry for its support. He was indicted for manslaughter in the first degree; but the jury brought in a verdict of manslaughter in the second degree with a recommendation of the "utmost clemency"; and the judge sentenced him to not less than five years nor more than ten, execution to be stayed, and the defendant to be placed on probation, from which he was discharged in December, 1945. Concededly, except for this act he conducted himself as a person of "good moral character" during the five years before he filed his petition. Indeed, if he had waited before filing his petition from September 22, to October 14, 1944, he would have had a clear record for the necessary period, and would have been admitted without question.

■■ Very recently we had to pass upon the phrase "good moral character" in the Nationality Act;[1] and we said that it set as a test, not those standards which we might ourselves approve, but whether "the moral feelings, now prevalent generally in this country" would "be outraged" by the conduct in question: that is, whether it conformed to "the generally accepted moral conventions current at the time."[2] In the absence of some national inquisition, like a Gallup poll, that is indeed a difficult test to apply; often questions will arise to which the answer is not ascertainable, and where the petitioner must fail only because he has the affirmative. Indeed, in the case at bar itself the answer is not wholly certain; for we all know that there are great numbers of people of the most unimpeachable virtue, who think it morally justifiable to put an end to a life so inexorably destined to be a burden to others, and—so far as any possible interest of its own is concerned—condemned to a brutish existence, lower indeed than all but the lowest forms of sentient life. Nor is it inevitably an answer to say that it must be immoral to do this, until the law provides security against the abuses which would inevitably follow, unless the practice were regulated. Many people—probably most people—do

not make it a final ethical test of conduct that it shall not violate law; few of us exact of ourselves or of others the unflinching obedience of a Socrates. There being no lawful means of accomplishing an end, which they believe to be righteous in itself, there have always been conscientious persons who feel no scruple in acting in defiance of a law which is repugnant to their personal convictions, and who even regard as martyrs those who suffer by doing so. In our own history it is only necessary to recall the Abolitionists. It is reasonably clear that the jury which tried Repouille did not feel any moral repulsion at his crime. Although it was inescapably murder in the first degree, not only did they bring in a verdict that was flatly in the face of the facts and utterly absurd—for manslaughter in the second degree presupposes that the killing has not been deliberate— but they coupled even that with a recommendation which showed that in substance they wished to exculpate the offender. Moreover, it is also plain, from the sentence which he imposed, that the judge could not have seriously disagreed with their recommendation.

One might be tempted to seize upon all this as a reliable measure of current morals; and no doubt it should have its place in the scale; but we should hesitate to accept it as decisive, when, for example, we compare it with the fate of a similar offender in Massachusetts, who, although he was not executed, was imprisoned for life. Left at large as we are, without means of verifying our conclusion, and without authority to substitute our individual beliefs, the outcome must needs be tentative; and not much is gained by discussion. We can say no more than that, quite independently of what may be the current moral feeling as to legally administered euthanasia, we feel reasonably secure in holding that only a minority of virtuous persons would deem the practise morally justifiable, while it remains in private hands, even when the provocation is as overwhelming as it was in this instance.

■ However, we wish to make it plain that a new petition would not be open to

---

[1] § 707(a) (3), Title 8 U.S.C.A.

[2] United States v. Francioso, 2 Cir., 164 F.2d 163.

this objection; and that the pitiable event, now long passed, will not prevent Repouille from taking his place among us as a citizen. The assertion in his brief that he did not "intend" the petition to be filed until 1945, unhappily is irrelevant; the statute makes crucial the actual date of filing.

Order reversed; petition dismissed without prejudice to the filing of a second petition.

FRANK, Circuit Judge (dissenting).

This decision may be of small practical import to this petitioner for citizenship, since perhaps, on filing a new petition, he will promptly become a citizen. But the method used by my colleagues in disposing of this case may, as a precedent, have a very serious significance for many another future petitioner whose "good moral character" may be questioned (for any one of a variety of reasons which may be unrelated to a "mercy killing") in circumstances where the necessity of filing a new petition may cause a long and injurious delay.[1] Accordingly, I think it desirable to dissent.

The district judge found that Repouille was a person of "good moral character." Presumably, in so finding, the judge attempted to employ that statutory standard in accordance with our decisions, i. e., as measured by conduct in conformity with "the generally accepted moral conventions at the time." My colleagues, although their sources of information concerning the pertinent mores are not shown to be superior to those of the district judge, reject his finding. And they do so, too, while conceding that their own conclusion is uncertain, and (as they put it) "tentative." I incline to think that the correct statutory test (the test Congress intended) is the attitude of our ethical leaders. That attitude would not be too difficult to learn; indeed, my colleagues indicate that they think such leaders would agree with the district judge. But the precedents in this circuit constrain us to be guided by contemporary public opinion about which, cloistered as judges are, we have but vague notions. (One recalls Gibbon's remark that usually a person who talks of "the opinion of the world at large" is really referring to "the few people with whom I happened to converse.")

Seeking to apply a standard of this type, courts usually do not rely on evidence but utilize what is often called the doctrine of "judicial notice," which, in matters of this sort, properly permits informal inquiries by the judges.[2] However, for such a purpose (as in the discharge of many other judicial duties), the courts are inadequately staffed,[3] so that sometimes "judicial notice" actually means judicial ignorance.

But the courts are not utterly helpless; such judicial impotence has its limits. Especially when an issue importantly affecting a man's life is involved, it seems to me that we need not, and ought not, resort to our mere unchecked surmises, remaining wholly (to quote my colleagues' words) "without means of verifying our conclusions." Because court judgments are the most solemn kind of governmental acts—backed up as they are, if necessary, by the armed force of the government—they should, I think, have a more solid foundation. I see no good reason why a man's rights should be jeopardized by judges' needless lack of knowledge.

I think, therefore, that, in any case such as this, where we lack the means of determining present-day public reactions, we should remand to the district judge with

---

[1] Consider, e.g., the case of a professional man, unable during a long delay, incident to his becoming a citizen, to practice his profession in certain states of this country.

[2] Cf. Wigmore, Evidence, 3d Ed., §§ 41, 2569, 2571, 2580, 2583; Thayer, A Preliminary Treatise On Evidence (1898) 308–309; Davis, An Approach to Problems of Evidence in The Administrative Process, 55 Harv.Law Rev. (1942) 364, 404–405, 410; Morris, Law and Fact, 55 Harv.Law Rev. (1942) 1303, 1318–1325.

In this very case, my colleagues have relied on informally procured information with reference to "the fate of a similar offender in Massachusetts."

[3] Think how any competent administrative agency would act if faced with a problem like that before us here.

Cf. Frank, If Men Were Angels (1942) 122–127; L. Hand, J., in Parke-Davis & Co. v. H. K. Mulford Co., C.C., 189 F. 95, 115; Cohen, Benjamin Nathan Cardozo, 1 Nat.Lawyers Guild (1938) 283, 285; Morris, Law and Fact, 55 Harv. Law Rev. (1942) 1303, 1318–1319.

these directions: The judge should give the petitioner and the government the opportunity to bring to the judge's attention reliable information on the subject, which he may supplement in any appropriate way. All the data so obtained should be put of record. On the basis thereof, the judge should reconsider his decision and arrive at a conclusion. Then, if there is another appeal, we can avoid sheer guessing, which alone is now available to us, and can reach something like an informed judgment.[4]

---

[4] Of course, we cannot thus expect to attain certainty, for certainty on such a subject as public opinion is unattainable.