## SCHMIDT v. UNITED STATES.

### No. 15, Docket 21325.

United States Court of Appeals
Second Circuit.

Argued Oct. 6, 1949.

Decided Oct. 24, 1949.

Edward L. Dubroff, Brooklyn, N. Y., for petitioner.

John F. X. McGohey, U. S. Attorney, New York City, John F. Ryan, New York City argued for respondent.

Before L. HAND, Chief Judge and SWAN and CLARK, Circuit Judges.

L. HAND, Chief Judge.

The petitioner has appealed from an order denying his petition for naturalization on the ground that he had failed to establish that he was a person of "good moral character" for the five years preceding the filing of the petition on July 5, 1944. He was a native of Germany, at that time thirty-nine years old, who had been admitted to the United States for permanent residence on January 17, 1939. He was a teacher of French and German in the College of the City of New York and was in every way qualified as a citizen, except that, in a moment of what may have been unnecessary frankness, he verified an affidavit before the examiner, which contained the following passage. "Now and then I engaged in an act in sexual intercourse with women. These women have been single and unmarried women. As to the frequency of these acts I can only state that they occurred now and then. My last such act took place about half a year ago with an unmarried woman." The only question in the case is whether by this admission the alien showed that he was not a person of "good moral character."

In United States ex rel. Iorio v. Day,[1] a deportation case where the Commissioner

1. 2 Cir., 34 F.2d 920, 921.

of Immigration had held that a violation of the Prohibition Law was "a crime involving moral turpitude", we said that it was "impossible to decide at all without some estimate, necessarily based on conjecture, as to what people generally feel." The phrase, "good moral character", in the Naturalization Law 8 U.S.C.A. § 155, is of the same kind, and makes the same demand. It is true that in Estrin v. United States [2] we held that a single act of adultery, unexplained and unpalliated, was alone enough to prevent the alien's naturalization; but we refused to say whether under the "common standards of morality" there might not be "extenuating circumstances" for such a single lapse. In Petitions of Rudder et al.[3] the question arose as to what those circumstances might be. Each of several aliens had been living for years with a single woman in an adulterous union, which apparently had not been concupiscent. Either the alien or the woman had been unable, for one reason or another, to get a divorce. We admitted them all because we did not "believe that the present sentiment of the community views as morally reprehensible such faithful and long continued relationships under the circumstances here disclosed." In United States v. Rubia [4] the alien was admitted upon substantially the same facts, save that he had had a good war record. In United States v. Francioso [5] we admitted an alien who had married, and was living with his niece under circumstances where we thought that "the moral feelings, now prevalent generally in this country" would not "be outraged because Francioso continued to live" with his wife and with four children whom he had had by her. The last case in which we passed on the clause was Repouille v. United States [6] where the alien, in order to relieve his family of crushing expense, had killed his child who was a hopeless bed-ridden idiot. We thought that such conduct did not conform to "the generally accepted moral conventions current at the time"; but we added: "Left at large as we are, without means of verifying our conclusion, and without authority to substitute our individual beliefs, the outcome must needs be tentative; and not much is gained by discussion." In two very recent cases [7] the Third Circuit by an equally divided court of all six judges, affirmed orders admitting two aliens in the following circumstances. In the first case, an unmarried man admitted that he had had occasional meretricious relations with a single woman for pay; in the second case, the facts were the same, except that the alien had a wife and children in Italy, from whom he had apparently not been legally separated.

The foregoing are the only cases that we have discovered in Courts of Appeal which touch nearly enough upon the case at bar to be important; and it must be owned that the law upon the subject is not free from doubt. We do not see how we can get any help from outside. It would not be practicable—even if the parties had asked for it, which they did not—to conduct an inquiry as to what is the common conscience on the point. Even though we could take a poll, it would not be enough merely to count heads, without any appraisal of the voters. A majority of the votes of those in prisons and brothels, for instance, ought scarcely to outweigh the votes of accredited churchgoers. Nor can we see any reason to suppose that the opinion of clergymen would be a more reliable estimate than our own. The situation is one in which to proceed by any available method would not be more likely to satisfy the impalpable standard, deliberately chosen, than that we adopted in the foregoing cases: that is, to resort to our own conjecture, fallible as we recognize it to be. It is true that recent investigations have attempted to throw light upon the actual habits of men in the petitioner's position, and they have disclosed—what few people would have doubted in any event—that his

2. 2 Cir., 80 F.2d 105.

3. 2 Cir., 159 F.2d 695, 698.

4. 5 Cir., 110 F.2d 92.

5. 2 Cir., 164 F.2d 163.

6. 2 Cir., 165 F.2d 152, 153.

7. U. S. v. Manfredi, 168 F.2d 752; U. S. v. Palombella, 168 F.2d 903.

452

practice is far from uncommon; but it does not follow that on this point common practice may not have diverged as much from precept as it often does. We have answered in the negative the question whether an unmarried man must live completely celibate, or forfeit his claim to a "good moral character"; but, as we have said, those were cases of continuous, though adulterous, union. We have now to say whether it makes a critical difference that the alien's lapses are casual, concupiscent and promiscuous, but not adulterous. We do not believe that discussion will make our conclusion more persuasive; but, so far as we can divine anything so tenebrous and impalpable as the common conscience, these added features do not make a critical difference.

Order reversed; petition granted.