**JOHNSON v. UNITED STATES.**
No. 136, Docket 21849.

United States Court of Appeals
Second Circuit.

Argued Jan. 3, 1951.

Decided Jan. 24, 1951.

Irving H. Saypol, U. S. Atty., New York City, John M. Cunneen, New York City, for appellant.

Herman Englander, New York City, Englander & Englander, New York City, for petitioner-appellee.

Before L. HAND, Chief Judge, and SWAN and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Chief Judge.

The United States appeals from an order admitting Johnson, an alien, to citizenship on the ground that the evidence did not show that he had been a person of "good moral character" for the five years preceding the filing of his petition on June 27, 1944. The petitioner was born in Russia on April 28, 1897, and was admitted to this country on June 3, 1913; he has always lived here, was married on November 14, 1923, and has a son born on April 19, 1926. The most intelligible way to present the other evidence in the record is in the sequence in which the "Naturalization Service" apparently discovered it. On July 11, 1944, about two weeks after the petition was filed, the Probation Officer of the Domestic Relations Court in the City of New York answered an inquiry of the "Naturalization Petitions Section" that Johnson and his wife had been "known to this Court since 1931"; that on April 15, 1940, he "was placed under order of $15 a week," and that a warrant had been issued for him on July 1, 1940, which had never been executed. The "Naturalization Petitions Section" next procured an affidavit from Johnson's wife on December 30, 1944, in which she said that he left her in 1932 and that the Domestic Relations Court had ordered him to pay her $20 a week which he never completely performed. The affidavit continued that in November, 1944, she had haled him once more into court and he "promised" to pay her six dollars a week, which also he failed to do, and that, for the preceding ten years he had been living with a married woman, who at the time he began to live with her was only twenty years old. Finally, it alleged that he had once paid his wife $12 for four weeks and "recently"

$6 for two weeks; that their son, who was in the Army, had allowed her an "allotment"; "but I think my husband should support me." On May 25, 1945, the Probation Officer wrote again that the order of the Domestic Relations Court had been "modified" on July 21 to $10 but that Johnson had paid nothing after April 3, 1945, so far as the records showed. On February 24, 1945, Johnson answered his wife's affidavit with one of his own in which he swore that he had lived with her till 1932 when they had been "dispossessed," and had separated until 1935, when they again lived together for three months. They separated finally, he swore, "because she was always demanding money" which he did not have, because he was out of a steady job till 1936; though they had been "many times" in court, and in November, 1944, her allowance had been reduced to six dollars a week which he had paid except for the last two weeks. He denied that he had "been living with any other woman since I left my wife," although he had taken one to dances and had visited another at the farm where she lived with her husband.

Apparently no further inquiries were made for two years, but on December 11, 1946, Johnson swore to another affidavit in the first part of which he declared that he had refused (apparently at an examination before some official) to answer as to his relations with a woman named Urich, because it might incriminate him. However, he did admit that they had occupied an apartment together from December 1944 to January 1945, though innocently; but he still refused to answer whether their relations had also been equally innocent during the whole of the five years before June 27, 1944, when he filed his petition. Finally, when the hearing came on before the judge he admitted that he had lived in illicit relations with Urich between 1939 and 1942, when she broke down nervously and had to go to a hospital till 1944; yet, when she came out in 1944 and resumed living with him for a month

or so their relations were innocent, as he had said before. The evidence taken as a whole leaves it uncertain why Johnson left his wife in 1935. On the one hand she swore that his liaison with Urich began ten years before December 30, 1944; on the other, he swore that he did not begin with Urich until two years later, which does not accord with hers. All that was clearly proved was that for five years—from 1937 to 1942—he was living with a paramour.

We held in Estrin v. United States, 2 Cir., 80 F.2d 105, that even a single lapse from marital fidelity, if there were no "extenuating circumstances," was not consistent with the requirement of five years of unbroken "good moral character".[1] That decision we regarded as still law when we decided Petitions of Rudder, 2 Cir., 159 F.2d 695, eleven years later; and it still holds good. Moreover, it rests upon the applicant to prove the "extenuating circumstances." We thought that the applicants in Petitions of Rudder, supra, had done so. In all four cases the relation had continued for many years with all the circumstances of lawful marriage except legal sanction. In one case the applicant's paramour had been divorced from her husband, but had neglected to get leave from the proper court to marry again, as the law required. In two others she was a woman separated from her husband, and was married to the applicant as soon as she was freed by the death of, or divorce from, her husband. In the fourth the applicant's wife, from whom he had been separated for fifteen years, had refused to give him a divorce; and the liaison did not begin until six or seven years after he had left her. We must own that the statute imposes upon courts a task impossible of assured execution; people differ as much about moral conduct as they do about beauty. There is not the slightest doubt that to many thousands of our citizens nothing will excuse any sexual irregularity, for some indeed this extends even to the subsequent marriage of an in-

1. United States v. Wexler, D.C., 8 F.2d 880; United States v. Unger, D.C., 26 F.2d 114.

nocent divorced spouse. On the other hand there are many thousands who look with a complaisant eye upon putting an easy end to one union and taking on another. Our duty in such cases, as we understand it, is to divine what the "common conscience" prevalent at the time demands;[2] and it is impossible in practice to ascertain what in a given instance it does demand. We should have no warrant for assuming that it meant the judgment of some ethical élite, even if any criterion were available to select them. Nor is it possible to make use of general principles, for almost every moral situation is unique; and no one could be sure how far the distinguishing features of each case would be morally relevant to one person and not to another. Theoretically, perhaps we might take as the test whether those who would approve the specific conduct would outnumber those who would disapprove; but it would be fantastically absurd to try to apply it. So it seems to us that we are confined to the best guess we can make of how such a poll would result.

In the case at bar the difficulties are not, however, very formidable. As we have said, we start with the premise that Johnson left his wife in 1935, and that his meretricious union with Urich began at least in 1937 and continued for five years. Such a situation does not seem to us to fall within our decision in the case of Jannibelli, that one of the four applicants in Petitions of Rudder, supra,[3] whose case is the nearest. True, it did not appear why Jannibelli had originally left his wife, but that was fifteen years before he filed his petition instead of nine as here; and the new union had lasted for eight or nine years and was continuing at the time of the hearing. Perhaps we should have insisted that Jannibelli prove why he had continued to live separate from his wife during the five years before he filed his petition; perhaps it was not a good answer that the separation went back so far. Be that as it may, even though we may have been too lenient then, the situation here calls for more explanations than Johnson could, or would, give. On this record it is left in doubt whether he did not without any just excuse desert his wife and child, and—at most only two years later—begin a liaison with a younger woman. Moreover, it is also doubtful whether he has not continually neglected to pay even those progressively reduced allowances which the court made to his wife. This combination of factors satisfies us that by the standard of the prevailing "common conscience" he did not prove himself a person of "good moral character," as the statute uses those words.

Order reversed; petition denied.

2. United States ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920, 921; United States v. Rubia, 5 Cir., 110 F.2d 92; United States v. Francioso, 2 Cir., 164 F.2d 163; Repouille v. United States, 2 Cir., 165 F.2d 152; Schmidt v. United States, 2 Cir., 177 F.2d 450; United States v. Burke, 2 Cir., 185 F.2d 678.

3. 159 F.2d 695, 698.