59 N.J. Super. 227 (1959)
157 A.2d 721
H., PLAINTIFF-APPELLANT,
v.
H., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 1959.
Decided December 17, 1959.
*230 Before Judges CONFORD, FREUND and HANEMAN.
Mr. Paul Bartel argued the cause for plaintiff-appellant (Messrs. Bartel and Sartoga, attorneys).
No appearance for defendant-respondent.
The opinion of the court was delivered by CONFORD, J.A.D.
This is an action for divorce by the plaintiff-husband for extreme cruelty of the defendant-wife consisting of her maintenance of an active homosexual relationship with another woman, one E.F. Another count in the complaint charging the same acts to constitute adultery was withdrawn at the trial. The case was uncontested.
Defendant was subpoenaed by plaintiff, and appeared, attended by counsel, who offered on her behalf objections to any testimony sought to be elicited from her on the ground that it would tend to incriminate her. The objection was overruled with respect to certain matters hereinafter referred to.
At the conclusion of plaintiff's case, no opposition proofs being tendered, the court reserved decision and later filed a written opinion expressing conclusions adverse to the asserted cause of action. It concluded that: "Nothing has been shown to indicate any lewd, lascivious or indecent act engaged in by either defendant or E.F. * * *"; that plaintiff's testimony of alleged acts of cruelty "is unsupported and is not corroborated"; and that the proofs failed to establish that defendant's conduct "had a deleterious effect" upon plaintiff's health or safety or that "his life or health would be endangered if he continued the marital relationship." The case was regarded as "factual," turning "solely on the question of credibility of the plaintiff, his witnesses and exhibits."
Plaintiff's testimony was to the following effect. He is 29, the defendant 35. They were married in 1949 and have two children. He is a truck driver. They had owned a home *231 in L. but moved to P. in October 1955, where they resided together until plaintiff left the defendant, for reasons to be stated, in June 1956. At L. defendant had "a lot of relations with teen-agers" which disturbed plaintiff because his wife was so much older than they. Defendant worked as an elevator operator in P. She told him occasionally that women she described as "Lesies" who got in her car would "try to make out with her." He told her it was not "right for her to do these things, to stay away from these women. They weren't normal * * *." She paid no attention to him, continuing to associate with them. "She started bringing them home with her." One night very late she brought home two or three of them. He identified them as "Lesies" by their masculine attire. He protested to defendant vehemently, but continued to live with her, hoping she would discontinue these associations. His work involved absences from home for days at a time. On several homecomings he found other women there who by their attire looked like Lesbians. For a period of time defendant had two young girls living there with her. She never answered his questions as to their origins but explained they watched the children for her while she was working or out of an evening. They had "arguments on this many times."
In June 1956 plaintiff came home one evening unexpectedly early, to find the apartment dark. When he turned the lights on he found the defendant in bed with a young woman by the name of E.F. Asked on direct examination as to his reaction to this occurrence, he testified: "Well, I just don't like the word `queers.' I just don't like Lesbians of any form. * * * When I seen that they were together I knew right away who she was and it just bothered me very much. I got mad, sick and nervous and everything all at once. * * * Well, right then and there I knew I just couldn't live with her any more. * * * After her being like that for so long, just changed my opinion of her as a woman." He moved out of the apartment at once and has never lived with defendant since.
*232 Later, Miss F. moved into the P. apartment (defendant testified this was in February 1957 and was arranged in order to economize after plaintiff's leaving) and lived there with defendant. Subsequently (October 1957, according to defendant) they moved to M, N.Y., where they had an apartment together, living there with the children of the parties. Defendant admitted to plaintiff at a domestic relations court hearing that she and Miss F. occupied the same bed. At the hearing herein she said they occupied the same bedroom. They were still living together at the time of the hearing.
In June 1958 plaintiff regained the custody of his children and they live with his parents. He resides at the home of his brother in F.
After leaving the P. apartment plaintiff came there occasionally to visit his children and to get some of his clothing. On one such visit, in going through a picture album, he discovered a number of photographs of the defendant in the company of Miss F. These were identified by defendant and admitted in evidence, after the court overruled objections offered on her behalf as a witness, based on the capacity of the answers to the questions to incriminate her. They were described as having been taken in 1956 and 1957. In most of them Miss F. appears dressed in mannish attire and with hair cut short and brushed back in the manner of a boy. The defendant is in normal feminine dress. Some of the poses show the couple embracing in the conventional manner of heterosexual sweethearts. One of the pictures shows them as one of a group of four couples, all women, in dancing posture on what seems to be a dance-floor, one partner in each couple being dressed in masculine attire.
On the occasion of another visit by plaintiff to his children (in defendant's absence) he found a box in her bedroom in which there was a packet of some 39 letters or notes inside an envelope. The outside of the envelope bore the inscription "To Fi" (Miss F's nickname) in handwriting which plaintiff identified as that of his wife. These communications *233 were excluded from evidence by the trial judge, without regard to plaintiff's undertaking to prove that they were in Miss F's handwriting, on the ground that they were not binding on the defendant. They were handed up to this court for examination on the argument. Some of the letters were written in script, others in print. They were almost invariably signed, "All my love to you always, F," and followed by a row of x's symbolizing osculation. Some are addressed to "B" (defendant's nickname), most to "Honey," "Baby," "Baby Doll," "Babe," and comparably common forms of endearment between romantic intimates. Most of the notes bear dates running from about the middle of February 1957 to the middle of May 1957. They appear to have been left by "Fi" for "B" to see when she returned home from work, the former apparently leaving for work after the other. Apart from an occasional mundane reference to matters of housekeeping or attention to the children, these notes are otherwise a repetitive cacophony of amorous attachment in most explicit terms. Only because of the circumstantial nature of the remainder of plaintiff's case and the trial court's dissatisfaction with its probative impact do we find it necessary to set out some of the more illuminating excerpts. (The court here quoted from a number of these letters.)
Plaintiff also testified that Miss F. had printed on the rear bumper of her car in red fluorescent tape the names "Fi" and "B." After finding the packet of letters plaintiff confronted his wife with them, and she responded: "So what. You can't prove it."
In its opinion the trial court made a point of the fact that the complaint specifies the date of commencement of the charged acts of extreme cruelty as being February 19, 1957, whereas the specific incident which precipitated the separation of the parties took place in June 1956, thereby assertedly justifying the inference that plaintiff left defendant "on his own volition" before the acts of cruelty commenced. However, the testimony is cogently persuasive that the incident of June 1956 climaxed a previous course of suspicious *234 activities by defendant, thereby inducing the separation, and we consequently granted plaintiff's request at the oral argument to amend the complaint so as to charge that date and incident as the commencement of the course of extreme cruelty complained of, thus conforming the allegations with the proofs. R.R. 4:15-2.
We address our attention to the appellant's contention that the trial court was in error in excluding from evidence the letters aforementioned on the ground that having been written by another they cannot be binding on defendant. It has often been held in this State that letters written to a philandering spouse by his paramour, retained by the spouse and found in his possession, may, taken together with the surrounding circumstances and other conduct of the possessor, be treated as an implied admission of their contents, or at least constitute some corroboration of the conduct complained of. Stickle v. Stickle, 48 N.J. Eq. 336, 344 (Ch. 1891); Cartan v. Cartan, 93 N.J. Eq. 175, 181 (E. & A. 1921); Dwyer v. Dwyer, 133 N.J. Eq. 272, 274 (E. & A. 1943); Friedman v. Friedman, 37 N.J. Super. 52, 61 (App. Div. 1955), certification denied 20 N.J. 135 (1955). See the treatment of the counterpart of this principle in criminal cases. State v. MacFarland, 83 N.J.L. 474 (E. & A. 1912); cf. State v. Martinek, 12 N.J. Super. 320 (App. Div. 1951). See also 4 Wigmore on Evidence (3d ed. 1940), § 1073, pp. 90-95. While possession of such letters is not of itself sufficient to raise an admission, it being required that the totality of the circumstances justifies an inference of acquiescence in the truth of the contents, Cartan, supra (93 N.J. Eq., at page 181), it is clear that such an inference was not only permissible here but fairly unavoidable. The photographs admitted in evidence, if nothing else, strongly indicate an abnormal type of intimacy between these women, and justify the conclusion that defendant was keeping these missives as tender mementoes of her affair with Miss F. The defendant's refusal on advice of counsel to testify as a witness for fear of incrimination, and her letting *235 charges of conduct such as that here involved go unchallenged, are additional justification for treating the letters as admissions against interest. They were unquestionably admissible in evidence under the principle of the cases cited. Plaintiff offered corroborative evidence of Miss F's handwriting. We are satisfied that the letters fully qualified as competent and material evidence in the case, and are admitting them in evidence under our original fact-finding jurisdiction.
With the letters in evidence, defendant's guilt of an active homosexual relationship with Miss F., otherwise a matter perhaps of no more than inference, becomes established beyond reasonable doubt. If the rule in adultery cases is applicable by analogy, inclination, opportunity, and, indeed, indulgence are clearly established. Corroboration, by circumstances and tacit admission, is amply made out. While the question as to whether active and continuous homosexuality constitutes extreme cruelty is new to our courts, we have no doubt about it on principle, granted a justified factual basis in the particular case for a conclusion that the defendant's activity "endangers the life or health of the aggrieved party, or renders his or her life one of such extreme discomfort and wretchedness as to incapacitate him or her, physically or mentally, from discharging the marital duties," see Friedman v. Friedman, supra (37 N.J. Super., at page 58).
Case authority on the point is meagre. In Herr, Marriage, Divorce and Separation, 11 New Jersey Practice Series (1950), § 683, p. 36, it is stated that sodomy, while not constituting adultery, may, upon coming to the knowledge of the other party, amount to extreme cruelty. No authority is cited. See also 27A C.J.S. Divorce § 28(4), p. 91; 17 Am. Jur., Divorce and Separation, § 83, p. 308. In several reported cases a charge of extreme cruelty was successfully based on unnatural sexual behavior of the spouse. Crutcher v. Crutcher, 86 Miss. 231, 38 So. 337 (Sup. Ct. 1905) (homosexuality); Anonymous, 3 Ohio S. & C.P. Dec. 450, 2 Ohio N.P. 342 (Cty. Ct. C.P. 1895) (bestiality); *236 Prather v. Prather, 99 Iowa 393, 68 N.W. 806 (Sup. Ct. 1896) (bestiality); Doolin v. Doolin, 211 Ky. 207, 277 S.W. 243 (Ct. App. 1925) (incest). Cf. Gilmore v. Gilmore, 45 Cal.2d 142, 287 P.2d 769 (Sup. Ct. 1955).
The trial judge in the instant case seemed to assume, sub silentio, that homosexual practices of a spouse could be conduct of a nature such as to qualify as extreme cruelty but that it was not sufficiently proven that such acts occurred here or that their effect on the plaintiff, actual or prospective, was as deleterious as required under the rule recited above. Plaintiff's position is that homosexual activity is extreme cruelty per se, requiring no specific proof of adverse effect upon the injured spouse. As we have already indicated, we entertain no doubt as to the fact of such practices by this defendant and the sufficiency of the proof and corroboration thereof. Nor need we determine whether they constitute extreme cruelty per se, as in the case of adultery in the marital home, see Fallon v. Fallon, 111 N.J. Eq. 512, 517 (E. & A. 1932), and the knowing communication of venereal disease, see Soos v. Soos, 14 N.J. Misc. 381 (Ch. 1936). We conclude that the required harmful effect of defendant's behavior has been sufficiently established. This is fairly to be deduced from the nature and extent of the actions complained of and plaintiff's testimony concerning their effect upon him.
It is difficult to conceive of a more grievous indignity to which a person of normal psychological and sexual constitution could be exposed than the entry by his spouse upon an active and continuous course of homosexual love with another. Added to the insult of sexual disloyalty per se (which is present in ordinary adultery) is the natural revulsion arising from knowledge of the fact that the spouse's betrayal takes the form of a perversion. In Crutcher v. Crutcher, supra, in holding homosexuality of a husband to constitute such cruelty as would warrant a judgment of divorce, the court (38 So., at page 337) found apt the following language of the Ohio *237 county court in the Anonymous case cited above, in reference to the bestiality of a spouse as amounting to cruelty:
"Unnatural practices of the kind charged here are an infamous indignity to the wife, and which would make the marriage relation so revolting to her that it would become impossible for her to discharge the duties of wife, and would defeat the whole purpose of the relation. In the natural course of things, they would cause mental suffering to the extent of affecting her health * * *."
We find ourselves in agreement with the Mississippi court in deeming the foregoing characterization accurately reflective of the presumptive effect of homosexuality upon a normal spouse, especially where it is of the aggravated degree reflected by the evidence in this case. Few behavioral deviations are more offensive to American mores than is homosexuality.[1] Common sense and modern psychiatric knowledge concur as to the incompatibility of homosexuality and the subsistence of marriage between one so afflicted and a normal person.[2]
In the case before us we need not indulge presumptions as to the inward turmoil produced in plaintiff by his discovery of his wife's perversion. Within his limited powers of articulation, he forcefully expressed, as noted earlier herein, his disgust at what he had learned about defendant and his resulting instinctive antipathy toward any further matrimonial relationships with her. This was a credible and reasonably expectable reaction of a normal husband and father. It required no further probative embellishment. In order *238 to dispel any question about this related to plaintiff's subsequent visits to defendant's apartment, we took the testimony of the plaintiff at the oral argument, in exercise of our original fact-finding jurisdiction, and he emphatically stated he had had no sexual relations with the defendant since he left her in 1956. We so find.
It is concededly the duty of the court closely to scrutinize the proofs in divorce cases based upon extreme cruelty (as, indeed, in all), particularly those which are uncontested, in order to protect the interest of the State in the preservation of the marriage relation against fraudulent invasion, and thus to require detailed, convincing proof of deleterious effects upon the plaintiff in cases within the ordinary range of assertedly cruel conduct by the defendant. But it is obvious that some kinds of cruel conduct are of so patently injurious a nature as to permit relatively less exacting proof of the resulting deleterious consequences, the acts themselves being clearly calculated to produce reactions in the injured spouse incompatible with a continuance of the marriage relationship and inimical to his mental or physical welfare. See Golden v. Arons, 36 N.J. Super. 371 (Ch. Div. 1955) (the parties both orthodox Jews; the defendant converting to Catholicism and attempting to convert plaintiff by psychologically debilitating tactics). There Judge Nimmo said (at page 374): "Where the conduct of a spouse is calculated to destroy the peace of mind and happiness of the other so as to utterly destroy the objects of matrimony, it amounts to extreme cruelty." See also Feybusch v. Feybusch, 110 N.J. Eq. 358 (E. & A. 1932); Hill v. Hill, 97 N.J. Eq. 237, 241 (Ch. 1925); Yorn v. Yorn, 138 N.J. Eq. 608, 610 (E. & A. 1946). Compare Steinbrugge v. Steinbrugge, 2 N.J. 77, 82 (1949), where, in reversing a decree nisi, the court noted that only one act of cruelty was corroborated and that one "not of such a nature as reasonably to lead to the apprehension of peril if cohabitation continued."
*239 Although no point was made of the circumstance in the opinion of the trial court, it will be noted that most of the acts of cruelty charged took place after the parties separated. We advert to this consideration as we left open the question of the substantive sufficiency of acts so timed in Morrone v. Morrone, 44 N.J. Super. 305, 311, 312 (App. Div. 1957). However, the general rule is that the fact that the parties happen to be living in a state of separation at the time the acts occur does not operate as a bar to their being assigned as a basis for a charge of extreme cruelty, Herr, op. cit., supra (§ 758, pp. 152, 153); Annotation, 129 A.L.R. 160 (1940). This principle is sound and we accept it. The state of separation may, in the particular circumstances presented, affect the capacity of the acts to injure the plaintiff, but this is a matter to be decided in each case on its own facts. In the case before us, the continued hurt and humiliation to the plaintiff are affected only in degree by the fact of separation, while the capacity of defendant's conduct to prevent the plaintiff's resuming the matrimonial relationship consistently with the maintenance of his health and welfare continues unabated.
The judgment is reversed and the cause remanded with directions for the entry of a judgment nisi in favor of the plaintiff.
NOTES
[1] Kinsey, Pomeroy and Martin, Sexual Behavior of the Human Female (1953), Ch. II, p. 476; George W. Henry (Associate Professor of Clinical Psychiatry, Cornell Medical School), All the Sexes, pp. 583-586; Ploscowe, Sex and the Law (1951), p. 213; Kirkpatrick, The Family (1955), p. 43.
[2] "If a person has developed a well-established homosexual pattern, the probabilities are that he will not have a genuine desire for marriage. It is doubtful that the interests of the individuals concerned, or of society, are well served by contracting marriage with a homosexual," Henry, op. cit., supra, at p. 347.