**Marie POSUSTA, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 116, Docket 26249.**

United States Court of Appeals
Second Circuit.

Argued Dec. 8, 1960.

Decided Jan. 6, 1961.

534

Edward L. Dubroff, Brooklyn, N. Y., for appellant.

Michael S. Fawer, Malcolm Richard Wilkey, Asst. Atty. Gen., Kenneth C. Shelver, Atty., Dept. of Justice, Washington, D. C. (S. Hazard Gillespie, Jr., U. S. Atty., S. D. New York, New York City, of counsel), for appellee.

Before CLARK, FRIENDLY and HAND, Circuit Judges.

HAND, Circuit Judge.

This is an appeal from an order of the District Court for the Southern District of New York denying a petition of Marie Posusta to be naturalized. The petitioner is a Czechoslovakian by birth and was admitted into the United States for permanent residence in 1952. She married Posusta in this country on January 24, 1959, and filed her petition on April 20 of that year. The question is whether she had proved that she was a person of "good moral character" from April 20, 1954 to April 20, 1959. The facts are as follows.

She had become Posusta's paramour in Czechoslovakia some time in 1936 when she was about nineteen, and she bore him one child in August, 1940, and another in January, 1947. Posusta had himself married a woman, named Krausova, on December 30, 1939, by whom he had previously had a child. It is to be assumed that the petitioner's relations with Posusta remained the same from 1937 or 1938, until he took his wife and her child with him to France in 1948. The petitioner followed them with her two children, and later took them to this country in 1952. After a visit back to France in January, 1953, she returned to the United States in July, 1954, Posusta having preceded her in May of that year. His marriage with Krausova ended in a divorce in March, 1954, so that there was not, and indeed could not have been, any adultery between them after April 20, 1954—five years before the petition was filed. On October 27, 1954, he and the petitioner took out a marriage license, and, although they did not marry until January 24, 1959, they continued their former relation with occasional interruptions.

Their explanation for the delay in marrying after Posusta had been divorced, was that he "wanted to take charge of" the education of Krausova's son which he thought he "could do better than" Krausova, and that, if he married again, "she would not give me the child at all." This child was apparently still a minor which to some extent confirms the avowed reason for their failure to marry for more than five years after they had the license. Moreover, the judge appears to have accepted this explanation of the delay. Upon this record the Naturalization Examiner recommended that the petition be granted, but the Regional Commissioner found otherwise, and Judge Levet agreed with him, and dismissed the petition on the ground that the petitioner had not proved that she was a person of "good moral character" for five years before she filed her petition.

 Section 1101 of Title 8 of the U.S.C.A. states eight specific conditions which an alien must satisfy in order to be naturalized, and then concludes that, although he may not be within any of the prohibited classes, he may nevertheless be denied naturalization if he "is or was not of good moral character." Much has been written as to the scope of that phrase, and, as was inevitable, there has been disagreement as to its meaning. However, it is settled that the test is not.

the personal moral principles of the individual judge or court before whom the applicant may come; the decision is to be based upon what he or it believes to be the ethical standards current at the time. United States ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920, 921; Repouille v. United States, 2 Cir., 165 F.2d 152, 153; United States v. Francioso, 2 Cir., 164 F.2d 163; Schmidt v. United States, 2 Cir., 177 F.2d 450, 451, 452; Johnson v. United States, 2 Cir., 186 F.2d 588, 590, 22 A.L.R.2d 240.

Moreover, a person may have a "good moral character" though he has been delinquent upon occasion in the past; it is enough if he shows that he does not transgress the accepted canons more often than is usual. In this respect this differs from the eight previously specified disqualifications which are unconditional. Obviously it is a test incapable of exact definition; the best we can do is to improvise the response that the "ordinary" man or woman would make, if the question were put whether the conduct was consistent with a "good moral character." Values are incommensurables; and the law is full of standards that admit of no quantitative measure; the most frequent instances are those that require "reasonable" appraisals between conflicting values or desires.

■ In the case at bar we think it enough that during the five years before she filed her petition the petitioner on the whole did what, as things stood, was consonant with "good moral character." We do not indeed mean that her relations with Posusta are to be condoned, or indeed that persistent incontinence may never preclude having "a good moral character"; but during the probationary period there were greatly extenuating circumstances. So far as appears, Posusta was her only lover and she had been true to him for over twenty years. Her relations with him were not concealed; indeed when they were both in this country they lived under the same roof. People will of course differ in their degree of condemnation of such breaches of the moral code; we can say no more

than that even a continued illicit relation is not inevitably an index of a bad "moral character." If she married Posusta, he would lose all power over his son to the son's great disadvantage. True, she would legitimatize her own children, but she could do that anyway after the boy grew up, as she did in fact. It seems at least a reasonable solution to let things stand as they were until the boy became old enough to be independent of his mother. We do not forget that she was not obliged to continue her relations with Posusta; but these had been in all respects connubial for many years except for the absence of a legal marriage. We cannot think that good "morals" compelled her to separate from him and leave her children fatherless in substance as they already were in law. Any decision was complicated, but situated as she was, the better course in 1954 was to accept the situation until Krausova lost her power over Krausova's son.

In what we have said we have not passed upon the petitioner's "good moral character" before April 20, 1954, and we do not forget subdivision (e) of § 1427, Title 8: the amendment that provided that in determining "good moral character" the court is not "limited" to the probationary period, but should consider "as a basis * * * conduct and acts at any time prior to that period." We read this as meaning that such evidence may be considered in so far as it throws light upon the character of the applicant in the probationary period. It is true that some traits of moral behavior are permanent; but circumstances may change us all. The petitioner's conduct before the probationary period certainly showed that in her youth she disregarded the accepted rules of sexual conduct; but by April 1954 she was over the age of 35 and it was to the last degree unlikely that after the experience she had had, she was still likely to engage in new illicit amatory adventures. "Good character" we measure by the probable responses to provocations.

■ The statute is not penal; it does not mean to punish for past conduct, but

to admit as citizens those who are likely to prove law-abiding and useful. Their past is of course some index of what is permanent in their make-up, but the test is what they will be, if they become citizens. We hold that the petitioner was a person of as "good moral character" as is necessary in order to become a citizen.

Order reversed; petition granted.