**In re Petition for Naturalization of Manuel LABADY.**
**Court No. 2270.**
**Petition No. 790587.**

United States District Court,
S. D. New York.

March 23, 1971.

Charles Spar, New York City, for petitioner.

Anargyros Camarinos, Gen. Atty. (Nationality), Immigration & Naturalization Service, New York City, for Government.

MANSFIELD, District Judge.

Petitioner, a 24-year old native and citizen of Cuba, was lawfully admitted into the United States as a permanent resident on December 3, 1960. On May 6, 1969, he filed his Petition for Naturalization pursuant to 8 U.S.C. § 1427. The Immigration and Naturalization Service ("the Service") opposes his petition on the ground that since he has been a homosexual he has not sustained his burden of establishing that within the five years immediately preceding the date of filing his petition he "has been and still is a person of good moral character * * *" within the meaning of 8 U.S.C. § 1427(a).[1]

Petitioner was a homosexual in Cuba and made this fact known to the Service authorities when he entered this country at the age of 14. The Medical Director and Chief of the Psychiatry Department of the United States Public Health Service Hospital in Staten Island, however, did not certify him as a "sexual deviate"

---

1. "§ 1427. Requirements of naturalization —Residence

"(a) No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totaling at least half of that time, and who has resided within the State in which the petitioner filed the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) during all the period referred to in this subsection has been and still is a *person of good moral character*, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." (Emphasis added)

Petitioner has the burden of establishing his good moral character. 8 U.S.C. § 1427(e).

or "psychopathic personality" under 8 U.S.C. § 1182(a) (4).[2] Since petitioner validly entered the country without deceit, the Service concedes that he is not now deportable.

After entering the United States in 1960 petitioner engaged in homosexual activities with several consenting adults. On the average he has been the active or passive partner in such activities about once a month, but the last occasion was about six months before his preliminary examinations by the Service upon his Petition for Naturalization. He has never engaged in homosexual activities with minors; all of his sexual acts have taken place in privacy, behind locked doors in hotel rooms. He has never engaged in such activity in any park, theatre, subway station, or any other public or semi-public place. He is unmarried and lives with his mother. There is no suggestion that his homosexual activities could harm a marriage relationship.

Petitioner has never been arrested. Though he has not applied for psychiatric treatment in the United States, he did unsuccessfully undergo therapy in Cuba. He does not drink; he does not frequent bars; he does not use narcotics. The Service stipulates that he has never been in trouble and, as his employer testified, he is highly regarded at his place of employment.

"Good moral character" is partially defined in 8 U.S.C. § 1101(f), which lists eight classes of conduct that preclude a finding of good moral character if engaged in during the five-year period immediately preceding the Naturalization Petition. These categories—e. g., habitual drunkard; adulterer; perjurer; convicted murderer (even if the conviction occurred before the five-year period); a person who within the five-year period was confined in a penal institution for 180 days or more; etc.—do not include petitioner's admitted conduct, but § 1101 (f) is not definitive and so provides by its own terms:

"The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not [within the five-year statutory period] of good moral character."

In determining good moral character,

"the test is not the personal moral principles of the individual judge or court before whom the applicant may come; the decision is to be based upon what he or it believes to be the ethical standards current at the time. United States ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920, 921; Repouille v. United States, 2 Cir., 165 F.2d 152, 153; United States v. Francioso, 2 Cir., 164 F.2d 163; Schmidt v. United States, 2 Cir., 177 F.2d 450, 451, 452; Johnson v. United States, 2 Cir., 186 F.2d 588, 590, 22 A.L.R.2d 240." (Posusta v. United States, 285 F.2d 533 at 535 (2d Cir. 1961) (per L. Hand, C. J.))

---

2. 8 U.S.C. § 1182(a) (4):
  "(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:
  *    *    *    *    *
  "(4) Aliens afflicted with psychopathic personality, or sexual deviation, or a mental defect; * * *."
In Boutilier v. Immigration Service, 387 U.S. 118, 120, 87 S.Ct. 1563, 1565, 18 L.Ed.2d 661 (1967), the Court held that "Congress intended the phrase 'psychopathic personality' to include homosexuals such as petitioner [Boutilier]." Boutilier does not control the present case, however, because petitioner in this case was lawfully admitted and is proceeding under § 1427(a). "Congress did not * * * concomitantly or at any other time amend § 101(f) [of the Immigration and Nationality Act, codified in 8 U.S.C. 1101 (f), which defines 'good moral character' as used in section 1427(a)] so as to certify an intent to include in the residual 'good moral character' generalization a [homosexual] deviancy as constituting a bar to naturalization." Petition for Naturalization of Mario Belle (E.D.N.Y. Feb. 19, 1969) (#681121). Boutilier, moreover, was a case involving public homosexuality; at least one episode occurred in a public park. 387 U.S. at 119, 87 S.Ct. 1563.

If the criterion were our own personal moral principles, we would deny the petition, subscribing as we personally do to the general "revulsion" or "moral conviction or instinctive feeling" against homosexuality. E. g., Report of the Committee on Homosexual Offenses and Prostitution Presented to Parliament by the Secretary of State for the Home Department and the Secretary of State for Scotland by Command of her Majesty (Sept. 1957 Cmmd. 247) (The Wolfenden Report) § B(54); see also Dew v. Halaby, 115 U.S.App.D.C. 171, 317 F.2d 582, 587 & n. 10 (1963), *cert. granted,* 376 U.S. 904, 84 S.Ct. 671, 11 L.Ed.2d 605, *cert. dismissed,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 550 (1964); H v. H, 59 N.J.Super. 227, 237, 157 A.2d 721, 727 (1959) ("Few behavioral deviations are more offensive to American *mores* than is homosexuality."); In re Petition for Naturalization of Olga Schmidt, 56 Misc.2d 456, 289 N.Y.S.2d 89, 92 (Sup. Ct.1968) (petitioner's admitted homosexual activity is not "in the court's opinion, consistent with good moral character as the 'ordinary man or woman' sees it."); cf. Note, Private Consensual Homosexual Behavior: The Crime and Its Enforcement, 70 Yale L.J. 623, 627 & n. 34 (1951). But see, Note, Government-Created Employment Disabilities of the Homosexual, 82 Harv.L. Rev. 1738, 1744 n. 25 (1969) (statistical knowledge of public attitudes towards homosexuality is extremely meager).

The test of "good moral character" prescribed by Judge Hand in *Posusta* was recognized by him as one that is "incapable of exact definition," p. 535, and in an earlier opinion he had confirmed that "good moral character" does not necessarily turn upon a popular vote.

> "Even though we could take a poll, it would not be enough merely to count heads, without any appraisal of the voters. A majority of the votes of those in prisons and brothels, for instance, ought scarcely to outweigh the votes of accredited churchgoers. Nor can we see any reason to suppose that the opinion of clergymen would

be a more reliable estimate than our own. The situation is one in which to proceed by any available method would not be more likely to satisfy the impalpable standard, deliberately chosen, than that we adopted in the foregoing cases: that is, to resort to our own conjecture, fallible as we recognize it to be." Schmidt v. United States, 177 F.2d 450 at 451 (2d Cir. 1949).

■ We believe that the most important factor to be considered is whether the challenged conduct is public or private in nature. If it is public or if it involves a large number of other persons, it may pose a threat to the community. If, on the other hand, it is entirely private, the likelihood of harm to others is minimal and any effort to regulate or penalize the conduct may lead to an unjustified invasion of the individual's constitutional rights. For instance, it is now established that official inquiry into a person's private sexual habits does violence to his constitutionally protected zone of privacy. Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Just as the state may not search "the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives," *Griswold, supra* at 485, 85 S.Ct. at 1682, the state may not prohibit a person from possessing obscene matter in his home, because of the "right to be free * * from unwarranted governmental intrusion into one's privacy." Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247–1248, 22 L.Ed.2d 542 (1969). See also, Powell v. Texas, 392 U.S. 514, 532, 88 S.Ct. 2145, 2154, 20 L.Ed.2d 1254 (1968) (state may use criminal laws to punish for *public* intoxication, since it had not attempted "to regulate appellant's behavior in the privacy of his own home.") (Marshall, J., concurring); United States v. Dellapia, 433 F.2d 1252 (2d Cir. 1970).

■ In short, private conduct which is not harmful to others, even though it may violate the personal moral code of most of us, does not violate public moral-

ity which is the only proper concern of § 1427. To hold otherwise would be to encourage governmental inquisition into an applicant's purely personal private temperament and habits (e. g., whether he harbors hate, malice or impure thoughts; whether he has ever engaged in masturbation, autoeroticism, fornication, or the like, etc.) even though such attitudes or conduct would not harm others.

Without condoning the purely private conduct here involved, we accept the principle that the naturalization laws are concerned with public, not private, morality. As Judge Hand stated in *Posusta, supra,* § 1427 "is not penal; it does not mean to punish for past conduct, but to admit as citizens those who are likely to prove law-abiding and useful." See in accord In re Naturalization of Denessy, 200 F.Supp. 354, 359 (D.Del.1961). The distinction between public and private morality is further recognized in the American Law Institute's Model Penal Code pp. 277–78, Tent. Draft No. 4 (1955), which provides:

"No harm to the secular community is involved in atypical sex practice in private between consenting adult partners. This area in private morals is the distinctive concern of spiritual authorities. It has been so recognized in a recent report by a group of Anglican clergy, with medical and legal advisers, calling upon the British Government to reexamine its harsh sodomy laws." [Footnote omitted]

There is nothing to indicate that private conduct of the type here involved would affect petitioner's ability to be "law-abiding and useful" to society.

We reject the Service's contention that petitioner's conduct has violated New York Penal Law § 130.38 which provides that

"A person is guilty of consensual sodomy when he engages in deviate sexual intercourse with another person."

The statute does not specifically extend to consensual sodomy performed *in private.* At common law a lewd, obscene, or indecent act included only open or public behavior. Rittenour v. District of Columbia, 163 A.2d 558, 559 (Mun.Ct. of Appeals for Wash., D.C.1960); Grisham v. State, 10 Tenn. (2 Yerger) 589, 594–597 (1831). We have found no prosecution of private homosexual acts under § 130.38. One New York court has stated in dictum that the private conduct of an admitted homosexual was not violative of any criminal statute. In re Petition of Olga Schmidt, 56 Misc.2d 456, 289 N.Y.S.2d 89, 92 (Sup.Ct.1968); cf. Petition for Naturalization of Mario Belle (E.D.N.Y. Feb. 19, 1969) (#681121), at 7, n. 1 (admitted homosexual acts of petitioner fell short of N.Y. Penal Law § 130.38 which requires for its commission "deviate sexual intercourse"). Many state statutes prohibiting homosexual conduct explicitly require "openness" or publicity. Note, Private Consensual Homosexual Behavior: The Crime and its Enforcement, 70 Yale L.J. 623, 635 (1961) (see appendix of this Note which lists the relevant statutes).[3] Under these circumstances, and bearing in mind that criminal laws should be strictly construed, it is highly unlikely that petitioner's private conduct has violated any state law.

3. Foreign penal laws also generally do not apply to private sexual conduct. Such countries as France, Italy, Mexico, Uruguay, Denmark, Sweden and Switzerland do not attempt to punish such private activities, which are considered to be the concern of private, not public, morality. See A.L.I. Model Penal Code p. 278 (Tent. Draft No. 4, 1955). Germany is contrary, *Id.* Canon law demands that the sexual crime be public before the penalty, which is self-enforcing and automatic, exists. Adultery, for instance, does not become a crime unless it is public. Can. 2357, § 2, discussed in letter from Rev. Connery, Prof. of Moral Theology, to J. Goldstein, Sept. 25, 1958, printed in R. Donnelly, J. Goldstein, & R. Schwartz, Criminal Law 139–40 (1962).

In any event a violation of § 130.38, which is a Class B misdemeanor carrying a maximum punishment of three months imprisonment, would not necessarily preclude a finding of good moral character within the meaning of § 1427 (a). In re Van Dessel, 243 F.Supp. 328 (E.D.Pa.1965), the court approved citizenship for a woman who had engaged in sexual relations with an unmarried man over a period of years. They had not married because of religious differences. The court concluded that although petitioner's acts of fornication were illegal in the state in which she was residing, crimes involving fornication were common in the law, and that the crime by itself—with consent of the other adult, also unmarried, and with the act done in private, not done for money, and with no begetting of an illegitimate child—was far less serious than the crimes listed in 8 U.S.C. § 1101(f) (e. g., adultery, murder, perjury, trafficking in narcotic drugs, aiding in the illegal entry into the United States, or conviction for any offense resulting in confinement in a penal institution for a period of 180 days or more). Petitioner's conduct similarly does not reach the seriousness of such crimes. See also In re Naturalization of Denessy, 200 F. Supp. 354 (D.Del.1961) (fornicator admitted to citizenship); Posusta v. United States, 285 F.2d 533 (2d Cir. 1961) (fornicator admitted to citizenship). *Van Dessel, Denessy* and *Posusta* do not condone fornication; they simply hold that private fornication between consenting unmarried adults is not a violation of the public morality which is the concern of § 1427.

The relative complacency with which the public has viewed private homosexual conduct is further evidenced by the sparing enforcement of homosexual laws already on the books.[4] It is generally agreed that except in the cases of corruption of minors, violence, and public solicitation—and petitioner is not included in any of these categories—the existing laws are substantially unenforced. E. g., A.L.I. Model Penal Code, pp. 278 (Tent. Draft No. 4, 1955) ; see Ploscowe, Sex Offenses in the New Penal Law, 32 Brooklyn L.Rev. 274, 284 (1966). A study of Los Angeles County showed that even when the police knew that homosexuals were privately cohabiting, no arrests would be made. Project, The Consenting Adult Homosexual and the Law: An Empirical Study of Enforcement and Administration in Los Angeles County, 13 U.C.L.A.L.Rev. 643, 688–89 (1966).

The extent to which homosexuals are offered employment is also relevant in determining public attitudes toward private homosexual conduct, since one purpose of the "good moral character" clause is to insure that prospective citizens will be useful to society and law-abiding. Turning to local government, we find that the New York City Civil Service Commission has adopted a policy of accepting homosexuals as workers, except in some positions such as penitentiary guards and playground attendants. N. Y. Times, May 9, 1969, at 1, col. 2, cited in Note, Government-Created Employment Disabilities of the Homosexual, 82 Harv.L.Rev. 1738, 1745 n. 30 (1969), and in Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161, 1167 n. 28 (1969). On the federal level, the Civil Service Commission no longer excludes all homosexuals from government service. The Commission as a matter of practice now "avoids expelling [homosexual] employees with many years service. It does not consider minor criminal conduct occurring two or more years before application for employment. It excludes only those whose homosexuality is a matter

---

4. To the extent that these laws seek to prohibit and punish private homosexual behavior between consenting adults, they are probably unconstitutional in light of Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); cf. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ; Powell v. Texas, 392 U.S. 514, 532, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (Marshall, J., concurring).

of public knowledge or record. Results have apparently been satisfactory." Note, Government-Created Employment Disabilities of the Homosexual, 82 Harv. L.Rev. 1738, 1745–46 (1969) (footnotes omitted). The Civil Service's power to fire homosexual employees has also been narrowed by the courts. Compare Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161, 1166–1167 (1969), with Dew v. Halaby, 115 U.S.App.D.C. 171, 317 F.2d 582 (1963), cert. granted, 376 U.S. 904, 84 S.Ct. 671, 11 L.Ed.2d 605, cert. dismissed by agreement of the parties when appellant reinstated with pay, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 550 (1964).

Lastly the Service points to certain passages in the Holy Bible as indicating that homosexual practices must be equated with lack of good moral character (see, e. g., Genesis 19:5; Leviticus 18:22; and Romans 1:26–27). Without conceding that § 1427 was intended to adopt Biblical standards, it appears that the portions of the Bible relied upon by the Service, like many other parts of the Holy Book, require interpretation and that even eminent theologians have not construed them as condemning all homosexuality. On the contrary it has been said that when read in context

> "[t]heir [the Scriptures'] aim is not to pillory the fact that some people experience this perversion inculpably. They denounce a homosexuality which had become the prevalent fashion and had spread to many who were really quite capable of normal sexual sentiments.

5. Our position is in accord with Judge Rosling's thoughtful opinion in Petition for Naturalization of Mario Belle (E.D. N.Y. Feb. 19, 1969) (#681121), and contrary to In re Petition for Naturalization of Olga Schmidt, 56 Misc.2d 456, 289

\* \* \* \* \* \*

"Lack of frank discussion has allowed a number of opinions to be formed about them [homosexuals] which are unjust when applied generally, because those who have such inclinations in fact are often *hard-working* and *honourable* people." (Emphasis added) De Nieuwe Katechismus (Commissioned by the Catholic Hierarchy of the Netherlands and produced by the Higher Catechetical Institute at Nijmegen), trans. by K. Smith, A New Catechism 384–85 (Herder & Herder ed. 1967).

■ Upon the record before us we conclude that petitioner has sustained his burden of compliance with Title 8 U.S.C. § 1427. He has led a quiet, peaceful, law-abiding life as an immigrant in the United States. Although he has engaged on occasion in purely private homosexual relations with consenting adults, he has not corrupted the morals of others, such as minors, or engaged in any publicly offensive activities, such as solicitation or public display. He is gainfully employed, highly regarded by his employer and associates, and he has submitted to therapy that was unsuccessful. Under all of the circumstances, setting aside our personal moral views, we cannot say that his conduct has violated public morality or indicated that he will be anything other than a law-abiding and useful citizen.[5]

The petition is granted.

It is so ordered.

N.Y.S.2d 89 (Sup.Ct.1968). The court in the latter case, however, frankly admitted that it had no evidence before it "concerning what the 'ordinary man or woman' would say about private homosexuality between consenting adults." *Id.* at 92.