**Petitions for Naturalization of F— G— and E— E— G—.**

United States District Court
S. D. New York.
Jan. 24, 1956.

Arthur S. Schapira, New York City, for petitioners.

William J. Kenville, New York City, Naturalization Examiner.

DAWSON, District Judge.

These contested petitions for naturalization raise the question whether adultery committed by petitioners before the effective date of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1101 et seq. but within the five-year period preceding the filing of the petitions for naturalization constitute *per se* a bar to naturalization because of the definition of good moral character contained in the 1952 Act, although it would not have been a bar *per se* under the preceding Act; and if not what considerations should be used by the Court at the present time in determining whether such adultery was an indication that petitioners had not established good moral character.

The petitioners are husband and wife.

The husband, formerly a Latvian, but now alleged to be stateless, had been a seaman. Deportation proceedings were instituted against him in 1951. As a result of these proceedings, he was granted suspension of deportation and a record of lawful entry for permanent residence was established as of March 15, 1949.

The wife, a native of Hungary, has resided permanently in the United States since her lawful admission for permanent residence on December 28, 1908.

The two petitioners met early in 1944. At that time, the female petitioner was married, but separated from her then husband. In 1945, while the female petitioner was still married, the two petitioners began to live together in New York as husband and wife. The former husband of the female petitioner, as a result thereof, started divorce proceedings against her in New York in 1951, charging that she had committed adultery with the male petitioner. The divorce proceeding was not contested, and on April 7, 1952, a final decree of divorce of the female petitioner was obtained by her then husband. Thereafter,

on June 7, 1952, the petitioners were married in New Jersey.

The male petitioner filed his petition for naturalization on March 7, 1955. The female petitioner filed her petition for naturalization on April 23, 1954.

The petitions are opposed by the Naturalization Examiner on the ground that during the five-year period preceding the filing of the petitions, the petitioners had not been persons of good moral character within the definition of that term contained in the Immigration and Nationality Act of 1952, since during that five-year period, they had been guilty of adultery.

Section 316 of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1427(a), makes it a prerequisite to naturalization that each petitioner:

" * * * for at least five years and during the five years immediately preceding the date of filing his petition * * * (3) * * * has been and still is a person of good moral character, * * *."

The Act further provides in 8 U.S.C.A. § 1101(f):

"(f) For the purposes of this Act—

"No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

"(1) * * *

"(2) one who during such period has committed adultery".

The requirement that a person be of "good moral character" for the period of five years preceding the date of filing the petition for naturalization and at the time of naturalization is not new. A similar requirement was imposed by § 307(a) of the Nationality Act of 1940, which was in effect prior to the 1952 Act. The question of what was meant by "good moral character" under the 1940 Act gave rise to various contested naturalization cases. The phrase was not defined in any precise fashion and the

cases resulted in different conclusions, based upon the interpretation of the phrase by the particular Courts before whom the question came. See Application of Murra, 7 Cir., 1950, 178 F.2d 670 at page 677; 51 Col.L.R. 838 (1951).

In a case substantially identical on its facts with the present one, the Court of Appeals for this Circuit decided, in 1947, that the fact that the petitioners had been living together in adultery during part of the five-year period would not be sufficient, in and of itself, to establish that they lacked the requisite "good moral character". Petitions of Rudder, 2 Cir., 1947, 159 F.2d 695.

When the 1952 Act was before Congress, it is apparent that the committees sought to lay down at least some minimum tests for what the Courts might conclude to be "good moral character".

The Senate Report on the 1952 Act states:

"It is believed that a greater degree of uniformity will be obtained in the application of the 'good moral character' test under the provisions of the bill * * *.

"Section 101(f) while not defining the term 'good moral character' provides standards as an aid for determining whether a person is of good moral character to be established in connection with a person's eligibility for certain benefits." Sen.Rep.No. 1137, 82nd Cong. 2nd Sess. 6 (1952). This thought was carried through by the House Report which stated:

"The * * * provisions * * * set minimum standards of moral character * * *." H.R.Rep.2096, 87th Cong. 2nd Sess. 128 (1952).

By inserting Section 101(f) in the 1952 Act, Congress set forth its criteria of a minimum standard of moral behavior.

However, in this case, petitioners urge that the savings clause of the 1952 Act enables them to procure naturalization. The applicable provisions of this Section of the Act are as follows:

"§ 405(a) Nothing contained in this Act, unless otherwise specifically provided therein, shall be construed to affect the validity of any declaration of intention, petition for naturalization, * * *; or to affect * * * any status, condition, right in process of acquisition, act, thing, liability, obligation, or matter, civil or criminal, done or existing, at the time this Act shall take effect; * * *." 8 U.S.C.A. § 1101 note.

The argument of petitioners runs as follows:

That the acts of adultery committed by them were all prior to April 7, 1952, and that, therefore, all these acts were prior to the effective date of the Immigration and Nationality Act of 1952, which became effective December 24, 1952;

That the male petitioner's admission for permanent residence in 1947, and the female petitioner's admission for permanent residence in 1908 gave them, so far as naturalization was concerned, a "right in process of acquisition" at the time of the passage of the 1952 Act, and that, therefore, their status as persons of good moral character must be governed by the standard which was in effect prior to the enactment of the definition of good moral character incorporated in the 1952 Act.

That their residence gave petitioners, so far as naturalization was concerned, a "right in process of acquisition" prior to the effective date of the 1952 Act is now well settled. United States v. Menasche, 1955, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615; see United States ex rel. Zacharias v. Shaughnessy, 2 Cir., 1955, 221 F.2d 578. But that right was no more than the right to be naturalized if during the five-year period, they had been persons of "good moral character". The right was not changed by the new Act. Their status was not changed by the new Act.

Under the previous Act, the determination of good moral character was a

matter for the individual discretion of the Judge or Courts before whom the matter came. So far as adultery was concerned, this discretion was removed by the new Act. The argument of petitioners, therefore, comes down to this: that at the time of the passage of the 1952 Act, they had a "right in process of acquisition" which was the right to have determined the issue of good moral character by the Court before whom the question came, rather than determined by any rigid rule or definition such as was included in the 1952 Act. With this contention, I agree.

■ Nevertheless, this still leaves before this Court the question of what is meant by "good moral character" even under the 1940 Act and when the determination is one to be made at the present time. This is a painful issue for any Judge to decide.[1]

Professor Edmund Cahn, in a thoughtful article in 51 Col.L.R. 838 (1951), reviews a number of cases in which the Court has been called upon in naturalization cases to determine whether a petitioner had good moral character. He points out that the phrase in the statute calls upon the Federal Judge to act "as a sort of father confessor or psychoanalyst or theoretical ethicist, not as the wielder of the judicial power", and that it calls upon the Judge "to do something for which virtually no one, on or off the bench, is ideally equipped".

What then is the best test which a Court can use in determining whether a petitioner has been a person of "good moral character". Judge Learned Hand has said that the Judge must consult the "moral feelings, now prevalent generally in this country", United States v. Francioso, 2 Cir., 1947, 164 F.2d 163; or the "'common conscience' prevalent at the time", Johnson v. United States, 2 Cir., 1951, 186 F.2d 588, 590. Judge Hand, however, in the latter case, pointed out that it is impossible in practice to ascertain what the common conscience does demand in given instances.

Are we to say that the common conscience of the community is merely an expression of what the community as a whole does? That would probably be wrong because innumerable persons commit acts which they themselves would probably consider acts of bad moral character.[2] It is not a question of what the community does, but rather what the community feels.

It would be a brave Judge indeed who could assume that he represents in himself the "common conscience" of the community. See dissenting opinion of Judge Frank in Repouille v. United States, 2 Cir., 1947, 165 F.2d 152.

In a search for a more objective test of what the community conscience is, where can a Court be better guided than by a declaration of Congress? Congress, in the 1952 Act, has stated that a person who has committed adultery shall not be found to be "a person of good moral character". While this test, by its terms, may be restricted in application to the 1952 Act, nevertheless, the Court at the present time is required to pass upon the question as to what is "good moral character", irrespective of the Act. There is no reason why the Court should not conclude that this declaration represents the moral feelings now prevalent generally in this country; in fact, there is every reason to suppose that it is a better test than the subjective feelings of an individual Judge. This is particularly true when a Judge is called upon to determine the moral feelings generally prevalent not alone in the community in which he lives, but the moral feelings prevalent in the country as a whole. There might be a better way of determining the common conscience on this

---

1. See Edmund Cahn, "The Moral Decision", p. 300 et seq. (Indiana University Press, 1955).

2. See Kinsey, "Sexual Behavior in the Human Male" (W. B. Saunders Co., 1948) at p. 585: "On the basis of these active data * * * about half of all the married males have intercourse with women other than their wives, at some time while they are married."

subject than by an Act of Congress, but I fail to know what it is.

I must conclude that petitioners have not borne their burden of proof of establishing that, in fact, they have been persons of good moral character in the period of five years preceding the filing of their petitions.

A denial of the petitions at the present time will not perpetually deny the petitioners the right of naturalization. They may apply next year when five years will have passed since the date during which the adultery was committed.

The petitions for naturalization are denied without prejudice to their renewal at any time after April 7, 1957.

So ordered.