**Petition for Naturalization of O———— N————.**

United States District Court
S. D. New York.

Sept. 21, 1964.

Laszlo Varga, New York City, for petitioner.

Anargyros E. Camarinos, New York City, designated examiner for Immigration and Naturalization Service.

FEINBERG, District Judge.

Petitioner seeks naturalization under Section 316(a) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1427(a). The question is whether he has established good moral character during the five year period required by law. The Immigration and Naturalization Service ("the Service") has recommended that the petition be denied because in that period petitioner committed adultery.

Petitioner is of Hungarian origin. In 1950, he was married in Hungary but separated from his wife in 1953, allegedly at her insistence. Petitioner entered the United States for permanent residence in 1958. In May 1960, he met a married woman who had been separated from her husband since 1946. They took an apartment in the Bronx, lived together as man and wife and were so regarded by the landlord, neighbors and friends. In 1963, both went to Mexico and obtained divorces from their respective spouses on August 9. On September 30, 1963, they were married in New Jersey and have continued to reside together. Petitioner sends his former wife in Hungary $25 a month for the support of their daughter.

The designated naturalization examiner concluded that on this record petitioner had failed to establish the good moral character required for naturalization. The examiner relied on Section 101 (f) (2) of the Act, 8 U.S.C. § 1101(f) (2), which provides that:

> "No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—
>
> \* \* \* \* \* \*
>
> "(2) one who during such period has committed adultery."

The examiner looked to the criminal law of New York, which defines adultery as "the sexual intercourse of two persons, either of whom is married to a third person." New York Pen. Law, McKinney's Consol. Laws, c. 40, § 100. The examiner recognized the position of the Service that "technical adultery"—unknowingly committed incident to an invalid marriage entered into in good faith —would not bar a finding of good moral character. However, the examiner pointed out that this was not such a case.

Adultery was specifically included in the Immigration and Nationality Act of 1952 as one of certain specified acts that would preclude a finding of good moral

character.[1] Prior to that time, the courts had not been furnished the specific standards now set forth in the statute, and it had been held by the Court of Appeals for this Circuit that a concededly adulterous relationship did not necessarily foreclose a finding of good moral character if extenuating circumstances were present. Petition of Rudder, 159 F.2d 695 (2 Cir. 1947). In that case, four male petitioners for naturalization had had relationships with women during the period for which good moral character was required. Two of them were living with married women who were separated from their husbands, and whom the petitioners married when death or divorce permitted the women to remarry. Another male petitioner was living with a woman who was divorced from her husband but who had not obtained permission from the court to remarry. The last petitioner had been separated from his wife for fifteen years, and was living with a single woman but could not marry her because he was unable to obtain a divorce from his wife. The Court of Appeals decided that all of these men were eligible to be naturalized. The Court stated (159 F.2d at 698):

> "What we are here asked to do is to brand as immoral long-term, faithful relationships between couples who consider themselves and are considered by their neighbors as upright and decent husbands and wives and would willingly have made legitimate their status if they could.
>
> * * * * We do not believe that the present sentiment of the community views as morally reprehensible such faithful and long continued relationships under the circumstances here disclosed."

Therefore, "because of the permanence, stability and apparent respectability of the relationships," the Court held that petitioners in that case were not disqualified from citizenship.

The similarities to this case are plain. Petitioner apparently did not desert his first wife, but left at her request. He had been separated from his wife for seven years when he met, in this country, the woman he later married. She had been separated from her husband at that time for fourteen years. She and petitioner swore to the examiner, and the examiner has not found to the contrary, that they wanted to marry from the beginning of their relationship but were unfamiliar with the procedures for obtaining a divorce. From almost the beginning of their relationship, petitioner and his present wife held themselves out to the public and considered each other as husband and wife. As soon as they thought they were legally able to do so, petitioner and his present wife were married. Petitioner still supports his daughter by his first wife. Compare Johnson v. United States, 186 F.2d 588 (2 Cir. 1951).

However, the key issue here is whether extenuating circumstances can be considered at all in view of the language of 8 U.S.C. § 1101(f) (2) enacted five years after the Rudder case. There are indications in opinions of the Court of Appeals for this Circuit that the statute now forecloses this type of inquiry. Thus, in United States ex rel. Zacharias v. Shaughnessy, 221 F.2d 578, 579 (2 Cir. 1955), the Court said: "Under the 1952 definition of good moral character, anyone guilty of adultery is *automatically* excluded." (Emphasis added.) It is true that this remark was dictum, since the Court held that the 1952 Act did not apply,[2] but the observation is obviously

---

1. Other types of conduct specifically enumerated in the 1952 Act as a bar to a finding of good moral character include habitual intoxication, conviction of two or more gambling offenses, confinement to a penal institution for 180 days or more, and conviction of murder. 8 U.S.C. § 1101(f).

2. The precise issue concerned eligibility for voluntary departure, rather than naturalization, but this is not significant because the 1952 Act requires the use of the same standards (8 U.S.C. § 1101) in determining eligibility for naturalization (8 U.S.C. § 1427(a)), voluntary departure (8 U.S.C. § 1254(b)), or suspension

pertinent. Similarly, in Posusta v. United States, 285 F.2d 533, 535 (2 Cir. 1961), the Court of Appeals characterized the eight disqualifications specified in Section 1101(f), which includes commission of adultery, as "unconditional." Here again the comment was dictum since the adultery had not occurred within the statutory period and, therefore, was not covered by the specific prohibition. Other cases support the view that under the 1952 Act, a finding of adultery within the statutory period is conclusive and bars the court from considering extenuating circumstances in determining whether the petitioner is a person of good moral character. Guttierrez-Sosa v. Del Guercio, 247 F.2d 266 (9 Cir. 1957); In re Matura, 142 F.Supp. 749 (S.D.N.Y.1956); Petitions of F— G— and E— E— G—, 137 F.Supp. 782 (S.D. N.Y.1956) (dictum). Thus, in the case last cited, the Court said (137 F.Supp. at 784–785):

> "Under the previous Act, the determination of good moral character was a matter for the individual discretion of the Judge or Courts before whom the matter came. So far as adultery was concerned, this discretion was removed by the new Act. * * * *"

However, some cases have taken a different approach. In Wadman v. Immigration and Naturalization Service, 329 F. 2d 812, 817 (9 Cir. 1964), the Court refused to characterize as adultery "isolated acts of intercourse by a married person, not amounting to cohabitation, occurring after that person's spouse has, without justification, willfully and permanently abandoned the marital relationship * * * *." While the case is distinguishable because the Court relied on California law in defining adultery, the Court did state that what Congress has found offensive is "extramarital intercourse which tends to destroy an existing

marriage; which evidences disregard of marital vows and responsibilities." In an analogous case involving eligibility for suspension of deportation, there is evident a similar reluctance to regard adultery as necessarily foreclosing a finding of good moral character. Dickhoff v. Shaughnessy, 142 F.Supp. 535 (S.D.N.Y. 1956). However, this case too is distinguishable since the adultery there was merely "technical," i. e., unknowingly resulting from a good faith marriage after an invalid divorce.[3]

The question is one of statutory construction. If the intention of Congress is reasonably clear, then ignoring that intention cannot be justified regardless of the Court's personal feelings as to the equities. A number of factors lead to the conclusion that extenuating circumstances, such as those present in Rudder, are not relevant under the present law.

First, the language of Section 1101(f) (2) is unequivocal. The statute states that no person shall be regarded as a person of good moral character if he has committed adultery during the period in question. This is not a case in which the allegation is made that the adultery, if any, is "technical" only. There is no dispute in this case that under both the criminal law of the place where the act occurred, New York Pen. Law § 100, and the general common law definition, see Perkins, Criminal Law 328–29 (1957), petitioner has committed adultery.

The legislative history of Section 1101 (f) (2) is more ambiguous than its language. The list of certain types of conduct precluding a finding of good moral character under the 1952 Act originated in the Senate. It appeared in S. 2055, introduced in August 1951, and was carried over into S. 2550, introduced in January 1952. The House bill (H.R. 5678) did not contain this provision, but the conference committee agreed to ac-

of deportation (8 U.S.C. § 1254(a) (1)). See Besterman, Commentary, 8 U.S.C. pt. 1, at pp. 79–80.

3. The Service has followed the Dickhoff case, Matter of U——, 7 I. & N. Dec. 380

(1956), apparently making the distinction adopted by the examiner here between conceded adultery when extenuating circumstances may be present, as in this case, and "technical adultery."

cept it.[4] In reporting on S. 2550, the Senate Committee on the Judiciary stated:

> "Section 101(f), while not, defining the term 'good moral character,' provides standards as an aid for determining whether a person is one of good moral character within the meaning of those provisions of the bill which require that good moral character be established for certain periods in connection with a person's eligibility for certain benefits. By providing who shall not be regarded as a person of good moral character, it is believed that a greater degree of uniformity will be obtained in the application of the 'good moral character' tests under the provisions of the bill."

S.Rep. No. 1137, 82d Cong., 2d Sess. 6 (1952). An earlier Senate Committee report sheds some additional light on what was meant by uniformity. In an extensive report which was the genesis of the 1952 Act, the Senate Committee on the Judiciary stated that "in the matter of determining good moral character * * * more uniform regulations should be employed by the Service and adopted by the court, *to the end that a higher general standard of goods* [sic] *morals* * * * *are established.*" S.Rep. No. 1515, 81st Cong., 2d Sess. 700–01 (1950). (Emphasis added.) The report particularly referred, disapprovingly, to prior judicial and administrative decisions that adultery under extenuating circumstances would, in certain cases, not preclude naturalization. Id. at 700. The Committee went on to recommend "that the prerequisite of good moral character * * * should be continued and even more strictly applied in determining the fitness of an applicant for citizenship." Id. at 712. The report was submitted to the Senate on April 20, 1950. On the same day, the first version of the "omnibus bill" (S. 3455) was introduced. However, this bill did not contain the negative definition of good moral character under scrutiny here. This key language also did not appear in a revised version of the original bill (S. 716) introduced in the Senate in January 1951. The language did appear for the first time in the third Senate version (S. 2055) of the "omnibus bill" introduced in August 1951. Between the second and third versions of the Senate bill, joint hearings were held by Senate and House Committees on the Judiciary to consider the bills then pending before the Senate and House. However, examination of the transcript of these hearings[5] does not reveal anything further of significance as to the origin of the language of Section 1101(f) (2). The language again appeared in S. 2550, the final version of the Senate bill.

Subsequent debates on the floor of Congress on what was ultimately to be the 1952 Act focused primarily on the larger issues involved, such as imposition of restrictive quotas on immigration. There are a few scattered remarks in the Senate debate that are relevant but not conclusive. Senator Morse, for example, in attacking S. 2550, referred to " * * * the rigid definition of good moral character which will limit the discretion of the judge in disposing of each case on its own merits" and characterized this as a change in the law.[6] However, Senator Morse was not the sponsor of the bill and his remarks must be balanced against the statement of the bill's sponsor, Senator McCarran, that the six major differences between the House and Senate bills (including the detailed definition of good moral character set forth in the Senate bill) were "technical or minor in nature."[7] However, Senator Lehman, in response, referred to these differences

---

4. H.R.Rep.No.2096, 82d Cong., 2d Sess. 128 (1952).

5. Joint Hearings on S. 716, H.R. 2379 and H.R. 2816 Before the Subcommittees of the Senate and House Committees on the Judiciary, 81st Cong., 1st Sess. (1951).

6. 98 Cong.Rec. 5786 (1952).

7. *Id.* at 5208.

as "substantial" and "major." [8] Other interchanges on the floor of the Senate are not more helpful. It is true that Senator McCarran referred to "a body of judicial and administrative interpretation of those provisions upon which we can rely." [9] However, this remark was general in character and referred only to the "provisions of the present law which have proved to be sound," without specifying what those were.[10] Similarly, the debates were replete with general statements that the Senate bill, which ultimately was passed, was a major change in the law in the fields of immigration and naturalization, rather than a codification.[11]

The legislative history is thus not too helpful on the precise meaning of Section 1101(f) (2) of the Act. It is certainly not sufficiently indicative of congressional intent to justify considering extenuating circumstances when the conduct in question concededly goes beyond mere technical adultery. If anything, the excerpts from the two Senate reports [12] are the most persuasive and they support the view that Section 1101(f) (2) was an attempt to tighten the law and exclude the relevance of extenuating circumstances in a clear case of adultery.

This conclusion is supported by contemporaneous understanding of the Act. The Act was passed over a presidential veto. In his veto message, President Truman stated that "time and again, examination discloses that the revisions of existing law that would be made by the bill are intended to solidify some restrictive practice of our immigration authorities, or to overrule or modify some ameliorative decision of the Supreme Court or other Federal courts." 98 Cong. Rec. 8084 (1952). The President appointed a President's Commission on Immigration and Naturalization to study and evaluate the immigration and naturalization policies of the United States and to make recommendations for legislative, administrative and other action. With respect to the provisions of the 1952 Act describing certain patterns of conduct as inconsistent with good moral character, the Commission reported that "in each instance, the new law usually attempts to negate a specific court decision." Report of the President's Commission on Immigration and Naturalization 246 (1953). Although the Report does not refer specifically to the Rudder decision supra, the Commission was of the opinion that the definition of moral character had been narrowed by the 1952 Act, and the Report particularly criticized the Act's provision on adultery. Ibid.

■■ Thus, the language of Section 1101(f) (2), contemporaneous construction and (to a lesser extent) the legislative history support the view that when Congress for the first time stated that adultery was inconsistent with good moral character, it intended to preclude a court from considering extenuating circumstances of the sort deemed controlling in Rudder. I do not believe it is my function in the light of this history to concern myself with the wisdom of the

8. *Id.* at 5329.

9. *Id.* at 5089.

10. *Ibid.* This general statement of Senator McCarran was relied on by the Court in Dickhoff v. Shaughnessy, 142 F.Supp. 535, 539 (S.D.N.Y.1956).

11. *E.g.*, 98 Cong.Rec. 5111, 5113 (1952), but for contrary references, see, *e.g.*, 98 Cong.Rec. 5088, 5330 (1952).

The Court in Dickhoff also referred to a statement in the conference report that the language of the Senate and House bills had been refined to make it clear

that the Attorney General "may not * * * capriciously deport an alien solely on the basis of inconsequential, unwitting infraction of the law." H.Rep.No. 2096, 82d Cong., 2d Sess. 127 (1952). However, a later section of the same report specifically discussed the adultery issue, perhaps indicating that the earlier reference did not deal with this question at all.

12. S.Rep.No.1137, 82d Cong., 2d Sess. 6 (1952); S.Rep.No.1515, 81st Cong., 2d Sess. 699–701 (1950).

statutory change in the law.[13] Nor are my personal views of whether petitioner is of good moral character relevant, since Congress has determined that issue on these facts.[14] Therefore, I reluctantly conclude that despite the obvious equities in petitioner's favor and the other evidence of good moral character, the recommendation of the examiner will be accepted. The petition for naturalization is denied, without prejudice to renewal at a later appropriate date.

Settle order on notice.

---

13. *Cf.* Petition for Naturalization of Salani, 196 F.Supp. 513 (N.D.Cal.1961).

14. For the view that under the pre-1952 law, the personal assessment of good moral character by the judge was desirable, see Cahn, Authority and Responsibility, 51 Colum.L.Rev. 838 (1951). This was contrary to the holdings of the Court of Appeals of this Circuit, chiefly by L. Hand, that it was not the judge's own assessment of good moral character that should control, but rather his judgment of the "conscience prevalent at the time," e. g., Johnson v. United States, 186 F.2d 588, 590 (2 Cir. 1951).