In re Vilhelms **BRIEDIS**.
Petition No. 424958.

United States District Court
N. D. Illinois, E. D.
Feb. 2, 1965.

Sam Myers, Naturalization Examiner.

Pearl M. Hart, Chicago, Ill., for petitioner.

MAROVITZ, District Judge.

This matter arises pursuant to a petition for naturalization filed by one Vilhelms Briedis. The designated naturalization examiner has submitted findings of fact and conclusions of law, along with his recommendation that the petition be denied inasmuch as petitioner has failed to establish that he was a person of good moral character during the period required by law.

The petitioner, 66 years old, a native and national of Latvia, was lawfully admitted into the United States for permanent residence on May 12, 1949. On April 25, 1963, he filed the instant peti-

**150**

tion for naturalization under the provisions of Section 316(a) of the Immigration and Nationality Act (Sec. 1427, Title 8 U.S.C.).

Pursuant to that filing petitioner was accorded two preliminary examinations, the factual findings of which are not contested, and will be adopted by this Court. In essence, the naturalization examiner found that some time after immigrating to this Country, petitioner sought to obtain a divorce from his first wife who remained in Eastern Europe. In December, 1960, while these divorce proceedings were pending, petitioner began to cohabit with his present wife, Florence McMann, and engaged in sexual intercourse with her. On October 15, 1961, petitioner was legally divorced. Thereafter, on December 15, 1961, he married his present wife.

The naturalization examiner concluded that on this record petitioner had failed to establish the good moral character required for naturalization. In support thereof, the examiner relied on Section 101(f)(2) of the Immigration and Nationality Act, (Sec. 1101(f)(2), Title 8 U.S.C.). That Section provides:

> "No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—
> * * *
> (2) one who during such period has committed adultery."

Section 1427, Title 8 U.S.C. requires the petitioner to establish such good moral character during the five-year period immediately preceding the date of filing his petition.

The naturalization authorities assert that historical definitions of adultery have no bearing on the ability of a petitioner to establish his good moral character under Section 101(f)(2). On matters of substantive law, they contend, "where there are no guiding federal statutes, federal courts must follow state statutes, and this, in effect, means there is no longer an applicable federal common law."

Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This approach, we submit, would lead to an absurb patchwork result, resting a petitioner's right to United States citizenship upon the whims and idiosyncrasies of individual state legislatures. This would be singularly contra to the express purpose of Article I, Section 8 of the United States Constitution, which empowers Congress "to establish an *uniform* Rule of Naturalization." Indeed, Section 101(f)(2) was enacted in 1952 to make more uniform the requirements to be met in establishing good moral character.

If the policy urged upon us is to be justified at all, it would have to be on the grounds that Congress sought by the 1952 statute to make good moral character dependent upon each state's legislative judgment of the common conscience and standards of the community it governs, the community in which the petitioner would reside. Accepting this principle, arguendo, we find that Section 46, Chapter 38, Ill.Rev.Stats., the applicable state law during the period in question, provided:

> "If any man and woman shall live together in an open state of adultery, or fornication, or adultery and fornication, every such person shall be fined not exceeding $500, or confined in the County jail not exceeding one year. * * * "

█ There is little question but that the petitioner had committed adultery within the language of the above section during the statutory period. But it must also be noted that the State of Illinois had in effect at the same time a statutory policy to forgive parties living in an open state of adultery in the event they should intermarry. See Application of Murra (7th Cir., 1949) 178 F.2d 670, 678. That is, a further provision of Section 46, Chap. 38, Ill.Rev.Stats., barred prosecution for criminal adultery of parties who later intermarry. While the Court will not indulge in the illusion that such provision voided the adultery in question *ab initio*, we are of the opinion that it does

express the state's judgment of community conscience and moral standards referred to above. If we are required to apply the statutory law of the forum state in which we sit, then we must do so in full, and not in piecemeal fashion. A reading of the Illinois statutes reveals that the state during the period in question would not have considered petitioner's acts so morally reprehensible as to subject him to criminal prosecution. Similarly, applying the standard set forth above, this Court would be loathe to deny citizenship to petitioner on the same ground.

 We are convinced, however, that the better view is to develop a uniform federal standard when interpreting a statute relating to the federal right to citizenship. Indeed, we are of the opinion that Congress, acting under Article I, Section 8, of the Constitution, intended this result. A learned review by Judge Wilfred Feinberg in Petition for Naturalization of O— N—, (D.C.N.Y., 1964), 233 F.Supp. 504 comes to the conclusion that the legislative history of the 1952 Act is more ambiguous than its language. While the Court there came to the ultimate conclusion that Congress did not intend extenuating circumstances to be considered under the Act, we cannot agree. The term "adultery" is not defined in this statute, or in any other federal enactment. The evils in applying the patchwork standards of each state have already been noted, (although we believe petitioner is not hurt by the Illinois statute in light of the provision barring prosecution of parties who later intermarry). The remaining alternative, which we today adopt, is that Congress intended the term, "adultery" to be read in the moral sense in which it is used. We are of the opinion that Congress intended to establish a uniform standard by codifying both those decisions in federal courts denying naturalization on grounds of morally reprehensible adultery, and those taking into consideration the extenuating circumstances which make the adultery at issue merely technical, and not a threat to public morality. Through a growing body of federal case law, Congress could then effect a uniform standard to be applied across the nation on what constitutes "adultery" within the framework of "good moral character" in which it is used.

While this approach was disapproved in Petition for Naturalization of O— N—, supra, it was adopted in Dickhoff v. Shaughnessy, (D.C.N.Y., 1956) 142 F. Supp. 535. Although that case dealt with deportation proceedings, the language clearly applies to the case at bar. The Court there, while discussing legislative history, stated:

"Senator McCarran, chairman of the Judiciary Committee, and sponsor of this bill which continued the old law's provisions as to good moral character and added the exclusion of those guilty of adultery, in speaking of provisions of the old law carried into his bill, stated: 'There has been built up a body of judicial and administrative interpretation of those provisions upon which we can rely.' 98 Cong. Rec. 5089. * * * Thus we have, basically, a desire for uniformity and continued reliance on past judicial interpretations."

At page 541, the Court continued:

"Defendant argues that the cases are no longer good law because adultery is specifically mentioned in § 1101(f)(2). But that argument is based on the assumption that Congress meant to change the case-law definition of adultery as it related to good moral character. For the reasons earlier discussed, I find it difficult to accept such an assumption."

We must therefore turn next to the case law interpreting good moral character in relationship to adultery. The leading case in this area is Petition of Rudder, (2d Cir., 1947) 159 F.2d 695. In that case, four male petitioners for naturalization had been involved in relationships with women during the statutory period for which good moral character was required. The Court, through Cir-

cuit Judge Swan, granted the petitions, stating:

"What we are asked to do is brand as immoral long-term faithful relationships between couples who consider themselves and are considered by their neighbors as upright and decent husbands and wives and would willingly have made legitimate their status if they could. * * * We do not believe that the present sentiment of the community views as morally reprehensible such faithful and long continued relationships under the circumstances here disclosed. * * * "Morality is not to be measured solely by conventional formality, nor are the mores of a community static. The trend of recent decisions is to stress stability and faithfulness in the 'marital' relationship rather than the mere legality of ties, which everyone knows may be so easily severed if the parties have the financial resources to obtain a Reno divorce."

There is further language in Wadman v. Immigration and Naturalization Service, (9th Cir., 1964) 329 F.2d 812, to the effect that what Congress is seeking to curtail is "extramarital intercourse which *tends to destroy an existing marriage.*" And in Petition of Kielblock, (D.C.Cal., 1958) 163 F.Supp. 687, 688, the Court, although concerned with an unmarried alien, said:

"The satisfaction of sexual appetite is a peculiarly private matter, ordinarily concerning only the participants in the sexual act. It becomes a matter of official concern when some statute of the United States or of a State is violated. Otherwise it will be treated by courts as an act of immorality if it be commercialized, as in the case of prostitution, or if illegitimate children are begotten. Likewise, open flaunting publicly what should be a private matter or promiscuity might adversely affect a petitioner's standing as a moral person."

 On the facts before us we find a man, now 66 years of age, who emigrated from a communist-controlled country in 1949. His wife chose to remain behind. Having been accustomed for many years to the comforts and security of a marital relationship, and unable to get a prompt divorce, petitioner elected to reside with a woman he loved. During the year of extra-marital cohabitation, petitioner fully intended to marry this woman when the delayed divorce was finalized. Indeed, he did so within two months of the divorce decree. Since 1961, they have lived faithfully together. The testimony at the April 22, 1964 hearing, demonstrates that petitioner and his wife expected the birth of a child in September, 1964.

Petitioner has been in this Country for fifteen years. He has integrated well into the community, working as a contractor, and maintaining his own business. There is no evidence that petitioner has in any real way violated the public morality. He has been a good husband and father. His actions, though imprudent, were motivated by love, and did not injure any person, or do any real harm to an existing marriage.

At the base of our democratic way of life is a belief that those persons who live responsibly within this Republic, who are governed by its laws, should have a right to participate in the functions of government. Petitioner has met the requirements of good moral character, as defined by the Courts of this Nation, for more than five years immediately preceding the filing of the instant petition. He is qualified to partake in those rights and duties inherent in citizenship in these United States. He shall now have an opportunity to justify our faith in him. The petition for naturalization is granted.