In re Petition for Naturalization of Francesco Adolf RUSSO.

In re Petition for Naturalization of Seth Ferdinand WEEKS.

Petition Nos. 753806, 755641.

United States District Court
S. D. New York.

Sept. 30, 1966.

---

Mary B. Tarcher, New York City, for petitioners, Legal Aid Society, Robert L. Feldt, New York City, of counsel.

John R. Speer, New York City, designated Examiner for the Immigration and Naturalization Service.

FRANKEL, District Judge.

The Immigration and Nationality Act of 1952, like its predecessors, requires aliens to demonstrate "good moral character" in order to qualify for citizenship, 8 U.S.C. § 1427(a) (3), or for other benefits, id., §§ 1254, 1259(c), 1435(b), 1438(b) (1), and 1439(e). In its application to the substantial fraction of us

who are neither beasts nor angels, the required judgment is not necessarily an easy one. Notions of "character" and "morality" are, to say it briefly, diverse. They are compounded of complex, rarely articulated, and subjective premises. But it offends widely cherished ideals to have the law reflect only the private vagaries of the judges. And so the courts, often acknowledging large vestiges of doubt, have done what they could to "divine [something] * * * so tenebrous and impalpable as the common conscience * * *." Schmidt v. United States, 177 F.2d 450, 452 (2d Cir. 1949).

Congress in the 1952 Act sought to ease the burden by providing "standards as an aid for determining whether a person is one of good moral character" for the several pertinent statutory purposes. S.Rep.No.1137, 82d Cong., 2d Sess. 6 (1952). Defining the concept by exclusion rather than inclusion, the legislators, in section 101(f) of the Act, 8 U.S.C. § 1101(f), described eight cate-

gories of conduct that would preclude a finding of good moral character.[1] The second of these, declaring that "one who * * * has committed adultery" during the relevant period must be found to lack good moral character, is the subject of present concern.

Two applicants for citizenship are before the court. Each must show, among other things, that he "has been [for the five years preceding his petition] and still is a person of good moral character * * *." 8 U.S.C. § 1427(a).[2] Both appear qualified in all respects except that they have committed acts during the five-year period that are claimed by the Immigration and Naturalization Service to constitute adultery within the meaning of the statutory proscription. Upon the facts, and for the reasons, outlined below, it is concluded that both petitions must be denied.

### I.

Petitioner Russo was born 38 years ago in Italy. He was admitted into this country for permanent residence on Feb-

1. 8 U.S.C. § 1101(f):
"For the purposes of this chapter—
"No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—
"(1) a habitual drunkard;
"(2) one who during such period has committed adultery;
"(3) a member of one or more of the classes of persons, whether excludable or not, described in paragraphs (11), (12), and (31) of section 1182(a) of this title [generally, polygamists, prostitutes, procurers, and aliens who have participated in illegal entries into the United States by other aliens]; or paragraphs (9), (10), and (23) of section 1182(a) of this title [generally, aliens who have committed crimes as variously defined and enumerated], if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;
"(4) one whose income is derived principally from illegal gambling activities;
"(5) one who has been convicted of two or more gambling offenses committed during such period;

"(6) one who has given false testimony for the purpose of obtaining any benefits under this chapter;
"(7) one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period;
"(8) one who at any time has been convicted of the crime of murder.
"The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."

2. See also § 1427(e):
"(e) In determining whether the petitioner has sustained the burden of establishing good moral character and the other qualifications for citizenship specified in subsection (a) of this section, the court shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may take into consideration as a basis for such determination the petitioner's conduct and acts at any time prior to that period."

ruary 2, 1954. He filed his petition for naturalization on March 5, 1964.

On September 29, 1952, while still living in Italy, petitioner married a woman several years his senior. The couple's life together was loveless, discordant, and short. About two months after the wedding day, Russo's wife left him and came to the United States. When he followed her here a little over a year later, there was an unsuccessful effort to salvage the marriage. The parties lived together for a month or so, then parted again, and have lived as strangers from each other ever since. There are no children of the marriage. Mrs. Russo supports herself as a matter of preference, and makes no demands of any kind upon petitioner. She has no interest, however, in remarriage, and no disposition to seek á divorce. Russo has lacked financial means to seek an out-of-state divorce and has lacked grounds for a New York divorce.

He has worked steadily in the printing trade over the years of his residence here. He has never been arrested or otherwise in conflict with the law, either here or in Italy. His health is good. He answered affirmatively when the Examiner saw fit to inquire whether he had "a normal sexual appetite." Asked why he sought citizenship, he said: "Because I love this country."

He acknowledges, however, that in the dozen years or so since his abortive marital experience, he has had sexual relations with several women. One of these was a married woman with children; with her, for a period of some four months less than five years ago, he had sexual relations about once a week. Another relationship, apparently with an unmarried woman, was of comparable character and duration. Otherwise, he reports, his sexual encounters have been with women he has seen "only once in a lifetime, * * * for nothing else but

for sexual need." Referring generally to the five years before his petition was filed, he says his intimacies with women have been rare: "Not once a year. * * * I can stay away a long time from women, because I have strong will, will power."

Petitioner Weeks is a native of France, 27 years old. He became a lawful permanent resident of this country at the age of five. He, too, has been generally law-abiding, with no arrests and a record of gainful employment as a statistical worker and entertainer. His marriage, though legally intact, has been even more fleeting as a practical reality than Russo's. He was married on January 30, 1964, to an Israeli citizen who was here as a tourist. His wife left him less than two weeks later, returned to Israel, and has remained there. His brief states that her parents have told him steps are being taken to terminate the marriage.

Weeks acknowledged in an affidavit sworn September 22, 1965, that he had had sexual relations with four women during the preceding year—once each with three of them, twice with the fourth. He named three of his partners, all from Albany, and stated they were unmarried. He could not remember the name of the fourth woman, whom he had been with about a year earlier in New York City, and he did not say whether or not she was married.

## II.

Despite its seeming simplicity and the apparent purpose of its framers to simplify, the declaration in § 101(f) (2) of the 1952 Act that adultery destroys good moral character has engendered some travail and contrariety of opinion in the courts. The statute gives no definition of "adultery," which turns out, despite its familiarity, to have a considerable variety of meanings.[3] The Immigration

---

**3.** "The difficulty * * * is that the word adultery is a word of infinite gradations of meaning. We have civil adultery and we have criminal adultery. Some states require that each of the partners be married to another, whereas in others it is sufficient if one of them is married to another. Some require continuing acts while in others a single transgression will suffice. We need not exhaust the catalog." In re Edgar, 253 F.Supp. 951, 952–953 (E.D.Mich.1966).

234

and Naturalization Service, in the cases at bar as well as others, has adapted to this difficulty by the flexible expedient of making the determination upon the law of the place where the arguably adulterous conduct occurs. This is proper, it has been said, because of the "belief that Congress' desire that there be uniformity related not to the method to be used in determining whether adultery had been committed, but related rather to the desire that *all* persons who had committed adultery should be barred from the prizes of the law." Matter of Pitzoff, 10 I. & M. Dec. 35, 37 (1962) (emphasis in original). It is open to question whether that explanation concerning the insignificance of "method," which could be thought to be the heart of the matter, is in its own terms a resoundingly satisfactory rationale. The question becomes sharper, and has been answered adversely to the quoted administrative view, when considered with the pertinent language of the Constitution (Art. I, § 8, cl. 4) empowering Congress to "establish an *uniform* Rule of Naturalization * * *" (emphasis added). In re Briedis, 238 F.Supp. 149, 151 (N.D. Ill.1965); In re Edgar, supra, 253 F. Supp. at 953.

Further uncertainty in following the laconic mandate of § 101(f) (2) has arisen because it is unclear whether the Congress intended to codify or to discard pre-1952 case law touching adultery and moral character for immigration and naturalization purposes. That earlier position, at least in this Circuit, had been that "technical" adultery, in the form of conduct "that the present sentiment of the community [does not view] * * * as morally reprehensible," would not bar a finding of good moral character. Petitions of Rudder et al., 159 F.2d 695, 698 (2d Cir. 1947). The cases since 1952 go both ways in deciding whether the doctrine of "extenuating circumstances" remains applicable now that the statute expressly denounces adultery as antithetical to good moral character. E. g., compare Petition for Naturalization of O———— N————, 233 F.Supp. 504 (S.D.N.Y.1964), and United States ex rel. Zacharias v. Shaughnessy, 221 F.2d 578, 579 (2d Cir. 1955), with Wadman v. Immigration and Naturalization Service, 329 F.2d 812 (9th Cir. 1964), and In re Briedis, 238 F.Supp. 149 (N.D.Ill. 1965).

These perplexities have been argued and considered in the two cases now before the court. In the end, however, it appears that neither case is within the area of the doubts that have divided the courts. It may be assumed *arguendo* that petitioners are correct in the two broad propositions they urge—i. e., (1) that state law is not determinative in defining adultery, and (2) that extenuating circumstances may still be efficacious to show good moral character. Even so, both men would appear to be barred by the statute.

■ Granting that the word "adultery" in the federal statute should have a uniform federal meaning, it must be deemed to reach a married person engaging in sexual intercourse with someone other than his spouse. This is the popular understanding of the word and the minimum meaning it has in the great majority of states. See Perkins, Criminal Law 329 (1957); 2 Wharton, Criminal Law and Procedure 466 (Anderson ed. 1957). When it undertook to particularize the content of "good moral character" by mentioning adultery, Congress may be supposed to have had in mind at least the prevalent morality as reflected with comparative objectivity in the laws of the several states.

As to the question of "extenuating circumstances," the decisions allowing for them deal with two types of situations:

(1) Cases involving long-term, stable relationships in which the petitioner has been "technically" barred from marrying, and where, commonly, he has regularized his status by the time he came to court. In re Edgar, 253 F.Supp. 951 (E.D.Mich.1966); In re Briedis, 238 F.Supp. 149 (N.D.Ill. 1965); In re Mayall's Naturalization, 154 F.Supp. 556 (E.D.Pa.

1957); Dickhoff v. Shaughnessy, 142 F.Supp. 535 (S.D.N.Y.1956).[4]

(2) The case—for which we are cited to only a single illustration, but that a weighty one—where the acts in question were extremely rare episodes in a long record of celibacy, and where there was no "disregard of marital vows and responsibilities." Wadman v. Immigration and Naturalization Service, 329 F.2d 812, 817 (9th Cir. 1964).

Petitioners fall in neither category.

■ In Russo's case the relationships were considerably more frequent and promiscuous than "the two isolated acts" involved in Wadman v. Immigration and Naturalization Service, supra, at 816, the precedent upon which he (as well as Weeks) puts heavy reliance. Furthermore, and more significantly, his story of the relevant period includes weekly adulterous relations, extending over some months, with a married woman who had children. Reflecting sensibilities that evoke some sympathy, he chose in his testimony to say no more than this about the woman, her family, and her marital circumstances. But the burden is his to establish good moral character, see 8 U.S.C. § 1427(e); Berenyi v. District Director, 352 F.2d 71, 73 (1st Cir. 1965), cert. granted, 384 U.S. 903, 86 S.Ct. 1339, 16 L.Ed.2d 357 (1966), and the limited account he has given weighs heavily against him. He does not claim that his is a case of merely "technical adultery" found in "long-term, faithful relationships between couples who consider themselves and are considered by their neighbors as upright and decent husbands and wives and would willingly have made legitimate their status if they could." Petitions of Rudder et al., supra, 159 F.2d at 698. On the other hand, seen from the somewhat different outlook that would excuse "isolated" relationships, he appears to have transgressed (or, at a minimum, to set nothing against the inference that he transgressed) the law's aversion to "that extramarital intercourse which tends to destroy an existing marriage; which evidences disregard of marital vows and responsibilities." Wadman v. Immigration and Naturalization Service, supra, 329 F.2d at 817.

■ The case of Weeks is different in its details, but similar in legal effect. His sexual history for the single year before his petition suggests a picture of somewhat casual promiscuity. While three of his brief liaisons were with unmarried ladies, the fourth woman seems to have been a passing stranger who may or may not have been married. Moreover, his petition reports an adjudication of paternity and a support order entered against him in 1961 and still outstanding. While that antedated his marriage, it is a factor the court is entitled, and perhaps required, to consider. See 8 U.S.C. § 1427(e). It reinforces an appearance of insufficient regard for the possible consequences of illicit sexual activity. And it is among the familiarly argued, though perhaps arguable, grounds for laws against adultery that they may serve to prevent the hardships of illegitimacy for the child and the community. See Model Penal Code, Tentative Draft No. 4, pp. 207, 209 (1955).

A thoughtful scholar argued a while ago that a judge, when he performs the duty of assessing "moral character," should rely frankly "on his own deliberate reflections and the call of his own conscience"; it is at least self deception, he wrote, to search for some immanent and supposedly more objective "common conscience." Cahn, Authority and Responsibility, 51 Colum.L.Rev. 838, 850 (1951). That philosopher's question is not open here. The narrow issue on which the parties have joined concerns

---

4. In a characteristically thorough and sensitive opinion, Judge Feinberg concluded that even such a person must be held to have lived in adultery during the period before the regularization. Petition for Naturalization of O——— N——, 233 F. Supp. 504 (S.D.N.Y.1964). As indicated earlier, it is not necessary here to decide whether the authority of his decision should be questioned.

the meaning of Congress when it spoke against adultery. Deciding only this, the court concludes that the statute requires both petitions to be, and they are, denied.

It is so ordered.