**In re Petition for Naturalization of Egbert William JOHNSON.**

No. 2271–679198.

United States District Court
E. D. New York.

Sept. 26, 1968.

Katherine Schwab, U. S. Naturalization Examiner, Brooklyn, N. Y.

Robert R. Jacobson, Brooklyn, N. Y., for petitioner; William Suffin, Brooklyn, N. Y., of counsel.

## OPINION

WEINSTEIN, District Judge.

This case poses the interesting question of whether a man who has sexual intercourse with a woman in the mistaken belief that she is unmarried is guilty of adultery within the definition of the Immigration and Nationality Act and so, as a matter of law, lacks the good moral character requisite for naturalization. 8 U.S.C. §§ 1101(f) (2), 1427(a) (3). Despite contentions in the past of the Immigration and Naturalization Service that the answer is yes, we agree with the position of the Service in this case that the answer is no. Compare Petition of Naturalization of Athana-

soulis, No. 18100, U.S.D.C., Toledo, Ohio (1966) (rejecting recommendation that petition be denied) with In the Matter of W—Y—S—, 6 Immigration and Nationality Dec. 801 (1955) (appeal denied on ground of adultery).

Petitioner, Egbert William Johnson, a forty year old British citizen, filed a petition for naturalization with this Court on August 16, 1966. The only doubt concerning his case arises from a relationship with his wife, the former Mrs. Sarah Daughtry.

The Daughtrys had married in 1952. They separated in 1954, after the birth of a son. There was no divorce and the marriage continued in effect until the death of Mr. Daughtry on December 24, 1966.

Long after the separation, petitioner and the then Mrs. Daughtry met in 1961. She informed him that she was unmarried and a widow. Petitioner proposed marriage to her several times. Mrs. Daughtry refused his proposals on the ground that she wished to wait until her son was less dependent. But she consented to sexual relations in 1966 even though she knew that she was still married. Petitioner had no knowledge of Mrs. Daughtry's marital status.

The relationship of petitioner and his future wife was private; they did not cohabit; there was no commercialization or flaunting; there was no promiscuity; there was no loss of good reputation. Cf. Petition of Kielblock, 163 F. Supp. 687, 688 (D.C.Cal.1958). Two middle-aged people contemplating marriage bedded together from time to time.

Clause (3) of subdivision (a) of section 1427 of title 8 of the United States Code requires that a petitioner for naturalization has been of "good moral character" during the five years preceding his petition. "For the purposes" of the statute "No person shall be regarded as * * * a person of good moral character" who "during such period has committed adultery." 8 U.S.C. § 1101(f) (2). Nowhere in the statute is "adultery" defined.

The word "adultery" lacks a uniform meaning. Under the statutes of New York, the state in which the extra-marital relations took place, a "person is guilty of adultery when he engages in sexual intercourse with another person at a time when he has a living spouse, or the other person has a living spouse." N.Y.Penal Law, McKinney's Consol. Laws, c. 40, § 255.17 (1967). This statute, effective September 1, 1967, also provides that "[i]n any prosecution for * * * adultery, it is an affirmative defense that the defendant acted under a reasonable belief that both he and the other person * * * to the sexual intercourse * * * were unmarried." N.Y.Penal Law § 255.20 (1967). At the time the acts were committed, however, the New York law defined the crime of adultery as "the sexual intercourse of two persons, either of whom is married to a third person." Former N.Y.Penal Law § 100. There was then no explicit provision for the defense of mistaken belief in regard to the marital status of the other party to coition. Cf. People v. Hopkins, 38 Misc. 2d 459, 238 N.Y.S.2d 485, 492 (Sup.Ct. 1963) (woman not guilty of adultery if she was misled as to male's marital status; dictum).

Putting aside the question of whether adultery encompasses only heterosexual intercourse (cf. Cohen v. Cohen, 200 Misc. 19, 103 N.Y.S.2d 426 (Sup.Ct. 1961); N.Y.Domestic Relations Law, McKinney's Consol.Laws, c. 14, § 170(4) (Supp.1967) (newly defining adultery to include homosexual intercourse)), the possible divergencies in meaning of the term "adultery" in the federal statute expand rapidly once the applicability of the laws of the states is considered. There is a basic distinction between those states which follow the common-law tort definition for criminal cases, and those which follow the law formerly applied by the ecclesiastical courts.

In those states using the common-law rule—six in number—adultery can

be committed only if the woman is married; the marital status of the man is irrelevant. If the woman is married, both parties commit adultery; if not, neither party commits the crime. See Moore, the Diverse Definitions of Criminal Adultery, 30 U.Kansas City L.Rev. 219, 223 (1962); Perkins, Criminal Law 328–29 (1957).

Where the ecclesiastical rule is followed—in seven states—adultery is committed solely by the married party to the extra-marital intercourse; the other party commits only fornication. There is adultery on the part of the male, if he is the married party. Moore, The Diverse Definitions of Criminal Adultery, 30 U.Kansas City L.Rev. 219, 223–24 (1962).

The remaining states either do not define the crime by statute or case law—three—or have adopted a modified approach combining the ecclesiastical and common-law theories. In these states, adultery is committed by both parties, if either party is married. Id. at 224–26. See generally the appendix summary of state statutes contained in Mueller, Legal Regulation of Sexual Conduct 84–88 (1961).

Many varying state policies modify the basic statutory approaches. In some states, only open and notorious cohabitation (the true common-law crime, as opposed to the tort of adultery) constitutes adultery. E. g., California Penal Code, §§ 269a and 269b; San Chez v. Superior Court, 153 Cal.App.2d 162, 165, 314 P.2d 135, 137, 138 (1957). In others, a state policy of forgiveness exists if the parties "later intermarry." E. g., In re Briedis, 238 F.Supp. 149, 150 (N.D.Ill.1965) (Illinois law; dictum).

Some states apparently hold that ignorance of the marital status of the other party provides no defense. Commonwealth v. Elwell, 43 Mass. 190 (1840); State v. Anderson, 140 Iowa 445, 118 N.W. 772 (1908). Others permit such a defense. E. g., N.Y.Penal Law § 255.20; State v. Cutshall, 109 N.C. 764, 14 S.E. 107, 108–109 (1891).

Given such a variety of meanings, mechanical application of the state law is not practical. Such divergency sits uncomfortably with the constitutional mandate to "establish an uniform Rule of Naturalization." Constitution, art. 1, § 8, cl. 4. In re Petitions of Russo and Weeks, 259 F.Supp. 230, 234 (S.D.N.Y. 1966); In re Edgar, 253 F.Supp. 951, 952–953 (E.D.Mich.1966); In re Briedis, 238 F.Supp. 149, 150 (N.D.Ill.1965) ("uniform federal standard when interpreting a statute relating to the federal right to citizenship"); S.Rep. No. 1515, 81st Cong., 2d Sess. 700–01 (1950) ("more uniform regulations should be employed"). Cf. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 2139, 20 L.Ed.2d 1118 (1968); Recent Developments, Illegitimates: Definition of Children Under Federal Welfare Legislation, 67 Colum. L.Rev. 984 (1967). But cf. DeSylva v. Ballentine, 351 U.S. 570, 580–582, 76 S.Ct. 974, 100 L.Ed. 1415 (1956). The need for uniformity in the application of federal law must be taken into account.

While the legislative history is ambiguous, the statutory design seems to have been to provide for reference to state law, at least as a point of departure. Petition for Naturalization of O—N—, 233 F. Supp. 504, 507–509 (S.D.N.Y.1964). This conclusion is supported both by the language of the statute and the prior case law. Subdivision (f) of section 1101 contains a number of specific reasons for disqualification on the ground of lack of "good moral character." A number of these—e. g., conviction for gambling offenses (§ 1101(f) (5)) or conviction of the crime of murder (§ 1101(f) (8))— by their nature require reference to state law for purposes of definition. In this context, it is relevant that earlier decisions in this area have relied largely, if not entirely, upon state law. Petition of Kielblock, 163 F.Supp. 687 (S.D.Cal. 1958) (no adultery under state law); United States ex rel. Zacharias v. Shaughnessy, 221 F.2d 578, 580 (2d Cir. 1955) (adultery under "both" state and common law); Wadman v. Immigration and Naturalization Service, 329 F.2d

812, 816 (9th Cir. 1964) (no adultery under state law).

■ In the area of morals, it is state law which ordinarily regulates individual conduct. It would be manifestly unfair to penalize an act as adultery when it is not so characterized by the local law regulating sexual behavior. Thus, unless the act is adulterous in the state where it was committed, it does not fall within the federal definition.

■ While primary reference to state law is, therefore, necessary, there are limitations upon such a reference inherent in the necessity of providing a relatively uniform administration of the naturalization law. The law to be applied in this case is the law of New York State, as modified by those standards of a federal nature which are necessary to assure minimal uniformity and fairness. Cf. Hill, State Procedural Law in Federal Diversity Litigation, 69 Harv.L.Rev. 66, 104 (1955) ("Rules of Decision Act is to be applied in a manner agreeable to the effectuation of federal interests not the least of which is the interest in a national uniformity in the administration of federal statutes.").

■ As already suggested, the New York law applicable in this case is uncertain. General principles of criminal law discussed below suggest that the defense of ignorance may have represented the New York law of adultery prior to the 1967 codification. But whether it did or not, mens rea is one of the minimum federal ingredients of the definition of adultery. Dickhoff v. Shaughnessy, 142 F.Supp. 535, 542 (S.D.N.Y.1956) ("Congress could not have intended to authorize the wholesale deportation of aliens who, accidentally, artificially, unknowingly, or unconsciously in appearance only, are found to have technically committed adultery"); Petition of Schlau, 41 F.Supp. 161, 162 (S.D.N.Y.1941), rev'd on other grounds, 136 F.2d 480 (2d Cir. 1943).

Mens rea—"the intentional doing of a morally wrong act, implying concomitant knowledge of the material facts"—has been an essential element of the common law of crimes for centuries. Hall, General Principles of Criminal Law 83 (2d ed.1960) (emphasis omitted). See generally, Williams, Criminal Law: The General Part § 47 (1953). This basic predicate for the extreme moral censure involved in denominating an act criminal has been waived in some instances of "social welfare offenses." But there are distinct constitutional limits on the attenuation of minimum requirements for the definition of crimes. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); Tot v. United States, 319 U.S. 463, 469–470, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); United States v. Lybrand, 279 F.Supp. 74, 82 (E.D.N.Y.1967). There is no warrant for applying the notion of strict liability to adultery. This is particularly true where, as in the case before us, the critical issue is good moral character— i. e., lack of mens rea—and an act of adultery is used as a mediate datum.

An argument once urged to support the implication of mens rea despite lack of knowledge was that the party who did not know the true marital status of the other party was nevertheless cognizant of the fact that he was committing some crime—apparently fornication. Commonwealth v. Elwell, 43 Mass. 190, 192 (1840). But this view seems unnecessarily harsh. Even under ancient Judaic law where adultery was punishable by a dreadful death (Mendelsohn, The Criminal Jurisprudence of the Ancient Hebrews, §§ 27, 29 (1890) (burning if priest's daughter; strangulation generally), a belief that the parties were not married constituted a defense. See Epstein, Sex Laws and Customs in Judaism, 210 (1948); cf. Leviticus 20:10; Deuteronomy 22:22. Judge Learned Hand gave short shrift to the argument that mere intercourse was necessarily immoral in Schmidt v. United States, 177 F.2d 450, 452 (2d Cir. 1949), when he noted: "We have answered in the negative the question whether an unmarried man

must live completely celibate, or forfeit his claim to a 'good moral character * * *.' " Cf. Packer, The Limits of the Criminal Sanction, 307–316 (1968). Finally, "[f]ornication, or illicit copulation with a person to whom the defendant is not married * * * is not, and never has been, proscribed in the criminal law of the State of New York." Marks and Paperno, Criminal Law in New York (2d ed.1967). The same may be said of the law in about half of the states, at least where there is no habitual cohabitation. See the appendix in Mueller, Legal Regulation of Sexual Conduct 84–88 (1961).

In short, "adultery" within the meaning of clause (2) of subdivision (f) of section 1101 of title 8 of the United States Code cannot include an unwitting act of the type involved here. The petition for naturalization is granted.